# EDWARD S. STANLEY vs. MAYOR AND CITY COUNCIL OF BALTIMORE.

*Municipal Corporations—Sale of City Stock—Authority— Change of Interest Rate—Limit on Price.*

Subject only to the exceptions set forth in Const., art. 11, sec. 7, no debt can be created or credit involved in behalf of the City of Baltimore, unless it has first the authorization of an act of the General Assembly, and the approval of a majority of the legal voters, after a submission of the question pursuant to an ordinance.                                    p. 290

In addition to the requirement of Const., art. 11, sec. 7, as to the creation of debts in behalf of the City of Baltimore, the Legislature may prescribe the procedure for the submission of the question to the electors, and any other supplementary provisions.                                    p. 291

The ordinance providing for the issuance of a loan in behalf
of the City of Baltimore must be submitted to the voters in
conformity to the method prescribed by the act authorizing the
loan.          .                              p. 291

Acts 1920, ch. 373, providing for the issuance of stock by
the City of Baltimore, and for the submission of the question
of such issuance to the legal voters, requires the whole ordi-
nance in regard thereto to be submitted for the ratification or
rejection of the electorate of the city.          .          p. 292

If the language of the act authorizing the creation of a debt
or the extension of credit in behalf of a municipality be spe-
cific and definite, the ordinance of the municipality authoriz-
ing the creation of the debt or credit must conform, but if the
authority be conferred by the Legislature in general terms, the
ordinance may authorize the debt or credit in particular terms,
provided these are within the contemplation of the act.     p. 293

Acts 1920, ch. 373, authorizing stock of the City of Balti-
more, to an amount not exceeding a sum named, to be issued
from time to time as the Mayor and City Council shall by
ordinance provide, for such amounts, payable at such times,
and bearing such rate of interest, as the Mayor and City Coun-
cil shall by ordinance provide, but no stock to be issued unless
the ordinance providing for the issuance thereof be submitted  ·
to the legal voters and approved by a majority of the votes cast,
contemplated but one ordinance to be submitted to the voters.   ·          .
pp. 294, 295

The act providing that the stock shall "bear such rate of
interest" as the Mayor and City Council shall "by ordinance  ·
provide," it was clearly intended that the stock should bear
but one rate, and not two or more.                    p. 295

The provision in the act, that the stock shall be issued from
time to time as the Mayor and City Council shall by ordinance
provide, looking to the actual sale, at appropriate times and
intervals, of the stock after its issue was authorized, conferred
a subsidiary power, which could be fully exercised in the origi-
nal ordinance providing for the issuance of the stock, to be
submitted to the electors, or could be reserved for exercise as
occasions might arise, until all the stock was issued, and was
effective without a referendum.                    p. 295

The Court of Appeals does not take judicial notice of the ordinances of Baltimore City.                        p. 296

Acts 1920, ch. 373, required the city to determine the amount of the issue of stock, the rate of interest it should bear, and the times when it should become payable, by an ordinance which was to be submitted to the voters.                        p. 296

Ordinance No. 379, providing for the issuance of city stock under the authority given by Acts 1920, ch. 373, having been submitted to the legal voters of the city, and approved by them, became a law, and, with respect to those matters covered by the ordinance, the city's power of legislation under the act was at an end, having been exhausted in its exercise.        p. 297

The power of the city under the act having been exhausted, it could not subsequently enact an ordinance providing that the unsold portion of the city stock authorized by the act should be issued at a lower rate of interest than that specified in the previous ordinance.                        p. 297

.Baltimore City Charter, sec. 6, subsec. 25, providing that nothing therein shall prevent the city from negotiating loans, already authorized but not yet entirely issued, or thereafter created and authorized, at a lower rate of interest than five per centum per annum, does not authorize the city to create a loan or prescribe any of its terms or rates of interest, nor does it empower the city to make any change in a city ordinance fixing the terms of a loan.                        p. 298

Such language of the charter, as originally enacted, was intended merely to remove any question that there was anything in the preceding language of the section to embarrass the city in negotiating a loan at a lower rate than five per centum, and did not empower the city to reduce the rate of a loan authorized under a special enabling act and to add a new restriction by inhibiting a sale at less than par.        p. 299

The Mayor and City Council of Baltimore have no power, without express authority, to change an authorized and fixed rate of interest, on city stock not yet issued, to a lower rate.

p. 299

A Baltimore City ordinance, providing for the issue of city stock, and adopted under the authority of Acts 1920, ch. 373, having been approved by a majority of the legal voters,

as required by the act, is binding upon the municipality and its representatives, as regards the terms of the issue of the stock.

p. 299

The power of the Mayor and City Council of Baltimore to issue city stock under authority of Acts 1920, ch. 373, is a special and limited one, and must be administered in the manner and according to the law creating it.

p. 300

The rule that a municipal corporation can exercise only those powers granted in express words, or necessarily implied in or incident to the powers expressly granted, or essential to its declared objects and purposes, not simply convenient thereto, applies when the officials of a municipality procure money through the sale of its securities.

p. 300

The Mayor and City Council of Baltimore have no implied power to change a rate of interest that was enacted pursuant to an express power to fix the rate, granted by Acts 1920, ch. 373, and an ordinance adopted in pursuance thereof, these being at once the source and the measure of all the city's power with respect to every share of city stock issued or to be issued under such act.

p. 301

The ordinance originally adopted by authority of Acts 1920, ch. 373, having directed the sale of the city stock authorized by said act in various denominations bearing five per centum interest, with no condition or restriction with respect to the price at which the stock should be sold, the city could not provide by a later ordinance that none of the stock, bearing a reduced rate of interest, could be sold for less than par.

p. 302

A taxpayer may sue, in behalf of himself and all other taxpayers who might become parties, to enjoin the sale of city stock as unauthorized.

p. 302

*Decided June 21st, 1924.*

Appeal from the Circuit Court of Baltimore City (STEIN, J.).

Bill by Edward S. Stanley against the Mayor and City Council of Baltimore, and others. From a decree for defendants, plaintiff appeals. Reversed.

The ordinances referred to in the opinion are as follows:

## No. 379 (of 1920).

An ordinance to authorize, in pursuance of an Act of the General Assembly of Maryland, passed in the year 1920, chapter 373, the Mayor and City Council of Baltimore to issue the stock of said corporation to an amount not exceeding twenty-six million dollars ($26,000,000) for the purpose of defraying the expenses and costs of the acquisition of school house sites and the construction of school buildings and additions to existing school buildings, and of the repair, improvement and reconstruction of existing school buildings; of the construction of additions and extensions of the sanitary sewerage and storm water drainage systems, including alterations, repairs and improvements of the existing plant and its appurtenances; and also to acquire by purchase or condemnation any sanitary or storm sewer or sewerage disposal plants as provided in Chapter 82 of the Acts of 1918; of condemning, opening, widening, straightening, closing, grading and paving streets, avenues and alleys, including the construction of the necessary bridges; of developing and improving the harbor of Baltimore, including the acquisition of sites and the construction of wharves, docks, piers, warehouses and the construction of bridges over navigable waters under the jurisdiction of the Harbor Board of Baltimore City; the construction of additional and extensions of the conduit system of Baltimore City; of the acquisition of sites and the construction, reconstruction, repair and improvement of police stations and fire engine house and the improvement of the police and fire departments of Baltimore City; and providing the amounts to be expended for said purposes in Baltimore City as it existed prior to chapter 82 of the Acts of 1918 and in the territory annexed to Baltimore City by said act, all as authorized by said Act of Assembly.

Whereas, by an Act of the General Assembly of Maryland, passed at its January Session in the year 1920, chapter 373, the Mayor and City Council of Baltimore is authorized to issue its stock to an amount not exceeding twenty-six

million dollars ($26,000,000) in the manner and on the terms therein set forth, the proceeds thereof to be used for the purpose of defraying the costs and expenses of the acquisition of school house sites and the construction of school buildings and additions to existing school buildings, and of the repair, improvement and reconstruction of existing school buildings; of the construction of additions and extensions of the sanitary sewerage and storm water drainage systems, including alterations, repairs and improvements of the existing plant and its appurtenances; and also to acquire by purchase or condemnation any sanitary or storm water sewer or sewerage disposal plants as provided in chapter 82 of the Acts of 1918; of condemning, opening, widening, straightening, closing, grading and paving streets, avenues and alleys, including the construction of the necessary bridges; of developing and improving the harbor of Baltimore, including the acquisition of sites and the construction of wharves, docks, piers, warehouses and construction of bridges over navigable waters under the jurisdiction of the Harbor Board of Baltimore City; of the construction of additions and extensions of the conduit system of Baltimore City; of the acquisition of sites and the construction, reconstruction, repair and improvement of police stations and fire engine houses and the improvement of the police and fire departments of Baltimore City, all as authorized by said act; and

Whereas, money is now needed for said purposes.

Section 1. Be it ordained by the Mayor and City Council of Baltimore, that the Commissioners of Finance be, and they are, hereby authorized and directed to issue the registered stock of the City of Baltimore to the amount of twenty-six million dollars ($26,000,000) from time to time, as the same may be required for the purposes hereinbefore named; and the said stock shall be sold by the said Commissioners of Finance from time to time, and at such times as shall be requisite, and the proceeds of the sale of said stock shall be used for the purposes hereinbefore named, provided that this ordinance shall not go into effect unless it shall be approved

by a majority of the votes of the legal voters of the City of Baltimore cast at the time and place hereinafter designated by this ordinance.

Section 2. And be it further ordained, that the said stock shall be issued in sums of one hundred dollars ($100.00) or multiples thereof, to be redeemable in twenty-five (25) yearly series, the first series to be redeemable on the first day of March, 1922, and a series to be redeemable on March 1st of each succeeding year until the last series has been redeemed, the amount to be included in the various series to be as follows:

Series  1, redeemable March 1st, 1922,    $544,000.00;
Series  2, redeemable March 1st, 1923,    $572,000.00;
Series  3, redeemable March 1st, 1924,    $601,000.00;
Series  4, redeemable March 1st, 1925,    $631,000.00;
Series  5, redeemable March 1st, 1926,    $663,000.00;
Series  6, redeemable March 1st, 1927,    $696,000.00;
Series  7, redeemable March 1st, 1928,    $730,000.00;
Series  8, redeemable March 1st, 1929,    $767,000.00;
Series  9, redeemable March 1st, 1930,    $805,000.00;
Series 10, redeemable March 1st, 1931,    $845,000.00;
Series 11, redeemable March 1st, 1932,    $887,000.00;
Series 12, redeemable March 1st, 1933,    $932,000.00;
Series 13, redeemable March 1st, 1934,    $978,000.00;
Series 14, redeemable March 1st, 1935, $1,027,000.00;
Series 15, redeemable March 1st, 1936, $1,079,000.00;
Series 16, redeemable March 1st, 1937, $1,133,000.00;
Series 17 redeemable March 1st, 1938, $1,190,000.00;
Series 18, redeemable March 1st, 1939, $1,249,000.00;
Series 19, redeemable March 1st, 1940, $1,311,000.00;
Series 20, redeemable March 1st, 1941, $1,376,000.00;
Series 21 redeemable March 1st, 1942, $1,445,000.00;
Series 22, redeemable March 1st, 1943, $1,517,000.00;
Series 23, redeemable March 1st, 1944, $1,593,000.00;
Series 24 redeemable March 1st, 1945, $1,673,000.00;
Series 25, redeemable March 1st, 1946, $1,755,000.00;

That the said stock shall bear interest at the rate of five per centum (5%) per annum during the respective periods

that the series in which it is issued may run, and that the said
interest shall be payable semi-annually on the first day of
March and the first day of September in each year.

Section 3. And be it further ordained, that a sum suffi-
cient to meet the interest on any outstanding stock, as well as
the principal of the current maturing series of said stock
shall be annually collected by taxation, and that a rate suffi-
cient to produce said sum shall be levied in each year upon
every one hundred dollars' worth of assessable property in
the City of Baltimore and in the proper proportion for any
greater or less amount.

Section 4. And be it further ordained, that this ordi-
nance shall be submitted to the legal voters of the City of
Baltimore, for their approval or disapproval at the election
to be held in the City of Baltimore on Tuesday, the second
day of November, 1920.

Section 5. And be it further ordained, that a copy of
this ordinance and notice of the time for holding said elec-
tion, shall be published in, at least, four of the daily news-
papers published in said City of Baltimore twice a week for
two weeks prior to said election.

Section 6. And be it further ordained, that the proceeds
of the stock hereby authorized to be issued shall be used for
the purpose of defraying the costs and expenses of the fol-
lowing public improvements, namely:

1. The proceeds of seven million dollars ($7,000,000)
of said stock, or so much thereof as may be necessary, shall
be used for the acquisition of school house sites and addi-
tions to existing sites, and the construction of school build-
ings and additions to existing school buildings, and for the
investment and reconstruction of existing school buildings,
of which amount four million two hundred and fifty thousand
($4,250,000) dollars shall be expended in Baltimore City
as it existed prior to chapter 82 of the Acts of 1918, and one
million seven hundred and fifty thousand ($1,750,000) dol-
lars shall be expended in the territory annexed to Baltimore
City by said act; and one million dollars ($1,000,000) shall

be used for the remodeling, repair and betterment of school buildings without limitation as to location in the city.

2. The proceeds of eight million dollars ($8,000,000) of said stock, or so much thereof as may be necessary, shall be used for the construction of additions and extensions of the sanitary sewerage and storm water drainage systems, including the right to construct additional sewerage disposal plants, pumping stations and altering, repairing, improving or extending the existing plants and appurtenances thereto and also for the acquisition by purchase or condemnation of any sanitary or storm water sewers or sewerage disposal plants, as provided in chapter 82 of the Acts of 1918; of which amount five million dollars ($5,000,000) shall be expended in Baltimore City as it existed prior to chapter 82 of the Acts of 1918 and three million dollars ($3,000,000) shall be expended in the territory annexed to Baltimore City by said act.

3. The proceeds of six million five hundred thousand dollars ($6,500,000) of said stock, or so much thereof as may be necessary, shall be used for condemning, opening, widening, straightening, closing, grading and paving streets, avenues and alleys, including the construction of the necessary bridges, of which amount three million dollars ($3,000,-000) shall be expended in Baltimore City as it existed prior to chapter 82 of the Acts of 1918, and three million five hundred thousand dollars ($3,500,000) shall be expended in the territory annexed to Baltimore City by said act.

4. The proceeds of two million five hundred thousand dollars ($2,500,000) of said stock, or so much thereof as may be necessary, shall be used for developing and improving the harbor of Baltimore, including the acquisition of sites and the construction of wharves, docks, piers, warehouses and the construction of bridges over navigable waters under the jurisdiction of the Harbor Board of Baltimore City.

5. The proceeds of one million one hundred and fifty thousand dollars ($1,150,000) of said stock, or so much thereof as may be necessary, shall be used for the construction

of additions and extensions of the conduit system of Baltimore City, of which amount, seven hundred and fifty thousand ($750,000) dollars shall be expended in Baltimore City as it existed prior to chapter 82 of the Acts of 1918 and four hundred thousand ($400,000) dollars shall be expended in the territory annexed to Baltimore City by said act.

6.    The proceeds of eight hundred and fifty thousand dollars ($850,000) of said stock, or so much thereof as may be necessary, shall be used for the acquisition of sites and the construction, reconstruction, repair and improvement of police stations and fire engine houses and the improvement of the police and fire departments of Baltimore City, of which amount two hundred and fifty thousand ($250,000) dollars shall be expended in Baltimore City as it existed prior to chapter 82 of the Acts of 1918, and six hundred thousand ($600,000) dollars shall be expended in the territory annexed to Baltimore City by said act.

Approved July 6, 1920.

## No. 159 (of 1924).

An ordinance to authorize the Commissioners of Finance of the Mayor and City Council of Baltimore to issue the unsold portion amounting to thirteen million, one hundred and ten thousand dollars ($13,110,000) of the General Improvement 1922-46 City Stock authorized by chapter 373 of the Acts of the General Assembly of the year 1920, and ordinance No. 379 of the Mayor and City Council of Baltimore, approved July 6th, 1920, at the rate of four and one-half per centum (4½%) interest per annum instead of five per centum (5%) per annum; provided said stock bearing interest at four and one-half per centum (4½%) per annum is sold at not less than its par value.

Whereas, the Commissioners of Finance of the Mayor and City Council of Baltimore were authorized by Ordinance No. 379 of the Mayor and City Council of Baltimore, approved July 6th, 1920, to issue the stock of the City of Baltimore to the amount of twenty-six million dollars ($26,-

000,000) from time to time, as the same may be required for the purposes therein anmed; and

Whereas, it is provided in said ordinance that the said stock shall bear interest at the rate of five per centum (5%) per annum during the respective periods that the series in which it is issued may run; and

Whereas, the Commissioners of Finance at their meeting on April 7th, 1924, passed the following resolution:

"Whereas, the members of the Board of Finance Commissioners, having investigated and considered general financial and industrial conditions, and particularly the market for the sale of Baltimore City stock; and

"Whereas, certain Baltimore City stock was authorized by chapter 373 of the Acts of the General Assembly of 1920, and Ordinance No. 379 of the Mayor and City Council of Baltimore, approved July 6th, 1920, and approved by the voters at the election held in November, 1920, said stock being authorized for what is known as the General Improvement 5% 1922-46 Loan; and

"Whereas, in the said Ordinance No. 379 of the Mayor and City Council of Baltimore, approved July 6th, 1920, it was provided that said stock shall bear interest at the rate of five per centum (5%) per annum during the respective periods that the series in which it is issued may run; and

"Whereas, thirteen million, one hundred and ten thousand dollars ($13,110,000) of the stock authorized as hereinbefore stated still remains unsold; and

"Whereas, in the judgment of the members of said board the said stock can be sold at not less than its par value if made to bear interest at four and one-half per centum (4½%) per annum; and

"Whereas, in the judgment of the members of said board it is to the best interests of the Mayor and City Council of Baltimore that the unsold part of said stock be issued at four and one-half per centum (4½%) per annum, provided that it can be sold at not less than par;

"Now, therefore, be it resolved, That the unsold portion, amounting to thirteen million, one hundred and ten thou-

sand dollars ($13,110,000) of the General Improvement 5%
1922-46 Loan, issued under authority of chapter 373 of the
Acts of the General Assembly of Maryland of the year 1920,
and Ordinance No. 379 of the Mayor and City Council of
Baltimore, approved July 6th, 1920, be issued bearing a rate
of interest of four and one-half per centum (4½%) per
annum, instead of five per centum (5%), authorized by
Ordinance No. 379, and that the City Solicitor be requested
to prepare an ordinance to be introduced in the City Council
authorizing the above change of interest rate," and

Whereas, it is to manifest interest of the Mayor and City
Council of Baltimore and the citizens thereof, that the unsold
portion amounting to thirteen million, one hundred and ten
thousand dollars ($13,110,000) of the General Improvement
1922-46 City stock shall bear interest at the rate of four and
one-half per centum (4½%) per annum instead of five per
centum (5%) per annum, provided said stock bearing in-
terest at four and one-half per centum (4½%) per annum is
sold at not less than its par value.

Section 1.   Be it ordained by the Mayor and City Council
of Baltimore, that the Commissioners of Finance be, and
they are, hereby authorized and directed to issue the unsold
portion amounting to thirteen million, one hundred and ten
thousand dollars ($13,110,000) of the General Improvement
1922-46 City stock authorized by chapter 373 of the Acts of
the General Assembly of Maryland of the year 1920, and
Ordinance No. 379 of the Mayor and City Council of Balti-
more, approved July 6th, 1920, so that it shall bear interest
at the rate of four and one-half per centum (4½%) per
annum during the respective periods that the series in which
it is issued may run, and that said interest shall be paid
semi-annually on the first day of March and the first day of
September, in each year; provided that the unsold portion
of said city stock bearing interest at the rate of four and
one-half per centum (4½%) per annum is sold by said
Commissioners of Finance at not less than its par value.

Approved April 22nd, 1924.

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, BOND, and PARKE, JJ.

*Clarence K. Bowie,* with whom were *Bowie & Clark* on the brief, for the appellant.

*Charles C. Wallace, Assistant City Solicitor,* with whom was *Philip B. Perlman, City Solicitor,* on the brief for the appellees.

PARKE, J., delivered the opinion of the Court.

By chapter 373 of the Acts of 1920 the General Assembly of Maryland authorized the Mayor and City Council of Baltimore to issue its stock to an amount not exceeding twenty-six million dollars for various municipal activities, the submission of an ordinance for that purpose to the legal voters of Baltimore City, and the enactment of an ordinance for the expenditure of the proceeds of the sale of stock by a special commission.

The special commission was first created, and then, pursuant to the terms of the act the ordinance was passed, submitted to the voters, and approved by a majority. The ordinance provided for and directed an issue and sale of registered stock to the amount of $26,000,000 in the sum of $100, or multiples thereof, redeemable in twenty-five years series, beginning with March 1st, 1922, and bearing interest at the rate of five per centum per annum, payable semi-annually.

The municipality issued $12,890,000 of this stock bearing the prescribed rate of five per centum per annum; and in April, 1924, the suggestion was made by the Finance Commission of Baltimore City that the unissued stock could be sold at not less than par, if the rate of interest were reduced to four and one-half per centum per annum. As a result of the suggestion, Ordinance No. 159 was passed and approved on April 22nd, 1924, authorizing and directing the residue of stock of $13,110,000 to be issued and sold, bearing interest at the rate of four and one-half per centum per annum, pro-

vided that none of it be disposed of for less than its par value.

The city was about to offer for sale and sell, at not less than its par value, to the highest bidder, $6,571,000 of this stock, bearing the reduced rate of interest. The appellant then intervened in behalf of himself and of all other taxpayers, who might become parties; and sought to enjoin the advertising or offering of said stock for sale, the expensive engraving of new certificates, and the sale of the stock as proposed, on the ground that the city had no authority to issue such stock at a lower or other rate than five per centum per annum. The appellee denied that he was entitled to relief, on the principal ground that by a proper construction of the Constitution of Maryland, the act in question, and the charter of the appellee, it had full power to change, from time to time, the rate of interest on any of the authorized but unissued stock.

The cause was then submitted on an agreed statement of facts, and the court dismissed the bill of complaint.

Except temporarily to borrow any amount of money to meet any deficiency in the city treasury, or to provide for any emergency arising from the necessity of maintaining the police, or preserving the safety and sanitary condition of the city, or to make due and proper arrangements for the renewal and extension, in whole or in part, of any and all debts and obligations created according to law before the adoption of the Constitution of 1867, section 7 of article 11 of the Maryland Constitution prohibits the creation of any debt, or the construction of works of internal improvement, involving the faith and credit of the city, unless such debt or credit be authorized by an act of the General Assembly of Maryland, and by an ordinance of the Mayor and City Council of Baltimore, submitted to the legal voters of the City of Baltimore, at such time and place as may be fixed by said ordinance, and approved by a majority of the votes cast at such time and place.

It is clear that, with only the exceptions above set forth, no debt can be created or credit involved, unless it have, first

the authorization of an act of the General Assembly of Maryland, and secondly, the approval of a majority of the legal voters, after a submission of the question pursuant to an ordinance.

In addition to this constitutional requirement, the Legislature may prescribe the procedure for the submission of the question to the electors, and any other supplementary provisions. An examination of the various enabling acts since 1908 will disclose that the Legislature has uniformly stipulated that the loan shall not be issued unless the ordinance of the Mayor and City Council of Baltimore providing for the issuance of the loan shall be submitted to the legal voters of the City of Baltimore, at such time and place as may be fixed by said ordinance, and be approved by a majority of the votes cast at such time and place, as required by the Constitution. (Acts 1922, ch. 379; Acts 1920, chs. 373, 374, 560; Acts 1916, chs. 584, 585, 189; Acts 1914, chs. 323, 722; Acts 1912, chs. 27, 428; Acts 1910, chs. 110, 92, 549, 570, 736, 630; Acts 1908, chs. 165, 188, 202, 247, 214; Acts 1906, chs. 401, 467½, 728; Acts 1904, chs. 274, 338, 349, 444, 468; Acts 1902, chs. 246, 333; Acts 1898, ch. 373.)

The necessity, under these enabling acts, for the ordinance itself, providing for the terms of the issuance of the loan, to be submitted to the voters pursuant to the terms of the act, is illustrated by the case of *Phila., B. & W. R. R. Co.* v. *Baltimore,* 121 Md. 504, 506, 507, where the Court stated with respect to similar provisions in the Acts 1910, ch. 110, that "the approval of the voters having been given to the project in the manner contemplated by the act, and by section 7 of article 11 of the Constitution of the State," the municipality had passed an ordinance to condemn and open the "Fallsway" over the course of Jones' Falls. This quoted remark of the Court is a recognition of the obvious necessity to submit the question to the voters in such a manner as not only to gratify the mandate of the Constitution but also to conform to the method prescribed by the act authorizing the loan. *Bond* v. *Baltimore,* 116 Md. 683, 684, 686.

In the case at bar, the enabling act declared that "no stock shall be issued in whole or in part unless the ordinance of the Mayor and City Council of Baltimore providing for the issuance thereof shall be submitted to the legal voters of Baltimore City at such time and place as may be fixed by said ordinance and be approved by a majority of the votes cast at such time and place as required by section 7 of article 11 of the Constitution of Maryland." From the ordinary meaning and grammatical construction of the language of this statute, it clearly and necessarily follows that, whatever its terms and its form, the whole ordinance as enacted must be submitted for the ratification or rejection of the electorate of the city; and, when adopted, became the law under which the debt is authorized and the credit of the city pledged.

The lower court held that the legislation embodied in this ordinance was subject to repeal and modification by the Mayor and City Council, and sustained the validity of a repealing and amending ordinance reducing the original rate of interest from five per centum per annum to four and one-half per centum, and adding the restriction that none of the stock should be sold for less than its par value. No opinion was filed, and the ground of the learned court's action was not disclosed by the decree. The appellee, however, urged an affirmance on the threefold argument: (1) that the Acts of 1920, chapter 376, empowered the appellee to determine, from time to time, the amounts of stock to be issued, when payable, and what rate of interest they should respectively bear; (2) that article 4, section 6, sub-section 25, of the Public Local Laws relating to Baltimore City, authorizes the municipality to issue its stock at a lower rate than five per centum, whenever it appears advisable and practicable so to do; and (3) that without express authority, and in the absence of any prohibition, the municipality may authorize the sale of its stock at a lower rate of interest than that fixed by an ordinance submitted to and approved by the voters, whenever it is to the benefit of the taxpayers.

The number and antagonistic reasons advanced by the appellee afford a striking illustration that the source of the

power to enact the ordinance in question did not rest on a clear and satisfactory delegation.

1. The act of the Legislature may authorize the creation of the debt or the extension of the credit in general or particular terms. If the language of the act be specific and definite, the ordinance of the municipality authorizing the creation of the debt or credit must conform; but, if the authority be conferred by the Legislature in general terms, the ordinance may authorize the debt or credit in particular terms, provided these are within the contemplation of the act of the General Assembly.

In the thirty-two enabling acts, which have been cited in this opinion, all but five provide that the loan shall bear such rate of interest as the Mayor and City Council shall by ordinance prescribe. Of the five exceptions, two prescribe that the rate or rates of interest shall be such as the ordinance shall specify (Acts 1906, ch. 401; Acts 1908, ch. 202); one, that the interest shall be at a rate not to exceed three and one-half per centum per annum (Acts 1918, ch. 373); one, that the rate shall not be more than four per centum per annum (Acts 1910, ch. 549), and one, that the stock shall bear such rate of interest, not exceeding five per centum per annum, as the ordinance shall designate. Every act, however, has this in common, that the municipality is by ordinance to fix the interest rate within the scope indicated.

These acts exemplify that if the municipality is to be given a limited range in fixing the rate of interest, the provision is made that the rate shall not exceed a certain per centum. Again, if the interest may be at one or more rates, the statute plainly confers the power by the phrase "rate or rates." However, if the rate is not limited, but is to be single and uniform on the whole issue of stock, the laws specify that the loan shall bear such rate of interest as the ordinance shall prescribe.

Chapter 373 of the Acts of 1920, before the Court on this record, falls within the largest class. The enactment in question authorized the issue of stock by the following paragraph:

"Section 1. Be it enacted by the General Assembly of Maryland, That the Mayor and City Council of Baltimore be, and it is hereby, authorized to issue the stock of said corporation˚ to an amount not exceeding. twenty-six million (26,000,000) dollars, said stock to .be issued from time to time as the Mayor and City Council of Baltimore shall by ordinance provide, and to be issued for such amounts and to be payable at such times and to bear such rate of interest as the Mayor and City Council of Baltimore shall by ordinance provide; but no stock shall be issued in whole or in part unless the ordinance of the Mayor and City Council of Baltimore providing for the issuance thereof shall be submitted to the legal voters of Baltimore City at such time and place as may be fixed by said ordinance and be approved by a majority of the votes cast at such time and place as required by section 7 of article 11 of the Constitution of Maryland."

The primary purpose of this enabling statute was to authorize the issue of a maximum amount of city stock. The essential formal contractual elements of the municipal obligation known as city stock are: (a) The amount of the obligation represented by every certificate of stock issued; (b) the time of maturity, and (c) the rate of interest. These elements are basic characteristics and are invariably and inseparably associated in the creation and issue of city stock. When, therefore, it is found that the authority to prescribe the maximum amount ("$26,000,000"); the denomination of every certificate ("issued for such amounts"); the maturities thereof ("payable at such times"), and the rate of interest ("to bear such rate of interest"), is conferred in a single sentence, and is to be exercised as the Mayor and City Council of Baltimore shall by ordinance provide, it is an inevitable conclusion that one ordinance, embracing these elements, was contemplated by the Legislature, and was the one intended by the statute to be submitted to the voters.

The apt employment of the singular number with respect to "stock" and its "amount" of issue, at a "rate" of interest

to be contained in an "ordinance" to be submitted at a "time" and "place" is only consistent with the passage of but a single ordinance, especially in view of the fact that the words used to express the denominations ("amounts") of the stock, and of its different maturities ("payable at such times") are plural. Furthermore, but one ordinance is to be submitted for approval or disapproval by the voters, and that ordinance is the one "providing for" the issuance of the stock.

The act is fully as explicit in restricting the interest to be paid to one rate for the entire issue of stock. It expressly enacts that the stock shall "bear such rate of interest as the Mayor and City Council of Baltimore shall by ordinance provide." Not only is "rate" singular in number, but so is "ordinance." Moreover, rate is qualified by "such" which has here a selective and exclusive signification. It would be difficult to find a clearer expression of the legislative will that the stock authorized should bear but one rate and not two or more different rates of interest.

The clause "said stock to be issued from time to time as the Mayor and City Council of Baltimore shall by ordinance provide," found in the fifth and sixth lines of section 1 of chapter 373 of the act, is set apart by commas and is parenthetical in nature, as it does not refer to the primary authorization of the stock, but is an auxiliary provision continuing in its nature, for the actual sale, at appropriate times and intervals, of the stock after its issue has been authorized.

This is a subsidiary power, but it may be fully exercised in the original ordinance providing for the issuance of the stock, and to be submitted to the electors (as was done in section 1 of Ordinance No. 379) ; or it may be reserved for when and as the occasions arise until all of the stock is issued. This power is effective without a referendum.

There is nothing in the Maryland cases to the contrary. In *Bond* v. *Baltimore,* 118 Md. 159, the statutes before this Court expressly authorized "such rate or rates of interest as the municipality should by ordinance provide." Acts 1906, ch. 401; Acts 1908, ch. 202. Under these acts it was held

that an ordinance was not unlawful in delegating to the commissioners of finance the power to fix the rate of interest at not more than four per centum per annum. The question was not considered by this Court in *Bond* v. *Baltimore,* 111 Md. 364 and 116 Md. 683. In these two cases the statutes were the Acts of 1908, ch. 165, and Acts of 1910, ch. 110, where the provisions as to the rate of interest were similar to those in this appeal, and the ordinance delegated the power to fix a rate which should not be more than four per cent., as may be determined by the commissioners of finance. In every one of these instances there was no attempt to justify more than one rate.

It should be noted that this Court does not take judicial notice of the ordinances of Baltimore City, and on this appeal the Court is confined to the record. The reference by this Court to the ordinances in the two cases last mentioned is only justified by the fact that the decisions were cited, and the records are in this Court, and so available in determining what was before the Court on these appeals.

The Court is, therefore, of the opinion that chapter 373 of the acts of 1920 did require the city to determine the amount of the issue of stock, the rate of interest it should bear, and the times when it should become payable, by an ordinance which was to be submitted to the voters. In this view of the act, Ordinance No. 379 must comply with these exactions. The rule is accurately stated by the learned and exact author of *Dillon on Corporations* (5th ed.), vol. 2, sec. 889, pp. 1376, 1377:

"A city can only act through its designated functionaries or agents, and these must determine within the statutory authority not only the expediency or necessity of the issue, but also such matters as the amount; the rate of interest which they shall bear; the time when they shall become payable; the time when redeemable; and the purposes for which the money is to be used. When the statute requires the proceedings for the issuance of the bonds to fix these matters, substantial com-

pliance with material requirements is essential to the validity of the issue in the absence of estoppel."

As the stock in question is unissued, there is no question of estoppel; nor can there be denial that Ordinance No. 379 provided for the issuance of the authorized stock within the terms of the statute, and so completely as to exhaust every occasion for further enactment under chapter 373 of the Acts of 1920. Ordinance No. 379 is too lengthy for insertion in this opinion, but it will be published, with Ordinance No. 159, in the report of this case.

Ordinance No. 379 provided for its publication and for notice of its submision to the legal voters of Baltimore City, who approved it on November 2, 1920. With this approval, Ordinance No. 379 became a law, and, with respect to those matters covered by the ordinance, the city's power of legislation under chapter 373 was at an end, having been exhausted in its exercise.

The municipality, however, enacted Ordinance No. 159, whereby the unsold portion of $26,000,000 of city stock authorized by chapter 373 of the acts of 1920, and by Ordinance No. 379, amounting to $13,110,000, should be issued at the rate of four and one-half per centum per annum, instead of five per centum, as specified by Ordinance No. 379, provided that such unsold portion of city stock, bearing interest at the rate of four and one-half per centum per annum, is sold at not less than its par value. There is nothing in the Act of 1920 to justify this ordinance.

2. In support of Ordinance No. 159, approved April 22, 1924, the appellee relies upon sub-section 25 of section 6 of the Baltimore City Charter.

The four separate sentences of sub-section 25 had their origin in section 467 of article 4 of the Public Local Laws of 1860; in chapter 75 of the Acts of 1861; in chapter 167 of the Acts of 1876, and in chapter 94 of the Acts of 1880 (amending the fourth section of chapter 237 of the Acts of 1876), respectively, which were codified in Public Local Laws of 1888 in sections 801, 802, 803 and 804 of article 4, title

"City of Baltimore," sub-title "Stocks, Bonds and Finances."
With material omissions in the sub-title these sections were
consolidated in one paragraph or section by the City Charter
adopted in 1898, where it has since remained unaltered as
sub-section 25.

The Act of 1876 authorized the issue of $5,000,000 of city
stock, the payment of all taxes thereon by the city and the
reduction of the rate of interest on the indebtedness of the
city; and its fourth section was amended by chapter 94 of
the Acts of 1880. It is this section which survives in the
present charter, and the last clause of its last sentence is
what the appellee invokes. Separated from its original con-
text, and with the conditions to which it was addressed en-
tirely changed by the new fiscal policy inaugurated under the
present Charter of Baltimore City, it is difficult to perceive
any subsisting application of this last clause. It would seem
the survival of an obsolete fragment of legislation. However,
it was adopted as part of the City Charter, and it becomes the
duty of this Court to see if it has any application to the ques-
tions on this record.

The sentence under consideration was made up of two dis-
tince clauses. The first clause authorized the city to make
provision for the payment of any taxes which the holder of
any city certificates or bonds might be legally liable to pay,
provided the rate of interest thereon should not exceed five
per centum; and this second clause immediately followed:
"and provided further that nothing herein contained shall
prevent the said city from negotiating said loans, or any part
thereof, already authorized by law, but not yet entirely is-
sued, or which may be hereafter created and authorized by
law, at a lower rate of interest than five per centum per an-
num, whenever it may appear to the said city practicable and
advisable to do so."

It is quite manifest that this is not a grant of any power.
It does not authorize the city to create a loan or prescribe any
of its terms or rates of interest, nor does it empower the city
to make any change, modification or alteration in any ordi-

nance of the city.  Its field of operation is expressly limited
to the section wherein it is found; and its single purpose is to
declare "that nothing herein contained" (*i. e.,* within the sec-
tion), "shall prevent the said city from negotiating" any un-
issued loan, or any that may be hereafter created and au-
thorized by law, at a lower rate of interest than five per cen-
tum per annum.

It explicitly affects certificates and bonds which have been,
or will be, authorized and created by appropriate and inde-
pendent enactment; and its single purpose is to remove any
question that there is anything in the preceding language of
the section to embarrass the city in negotiating a loan at a
lower rate than five per centum.

If the city were to sell the five per centum city stock, to be
issued under chapter 373 of the Acts of 1920, at 111, it
would be negotiating the loan at less than five per cent., and
nothing in sub-section 25 would prevent the negotiations.  It
would be a wholly unauthorized act of judicial usurpation to
read into sub-section 25 the power of the city to reduce the
rate of a loan authorized under a special enabling act and to
add a new restriction by inhibiting a sale at less than par.
*Baltimore City* v. *Bond,* 104 Md. 590, 593-595.

3.  The third ground assigned in support of the decree
is that, without express authority, the Mayor and City Coun-
cil of Baltimore may change an authorized, fixed rate of
interest to a lower rate whenever it is to the benefit of the
taxpayers, if the stock be unissued.  This theory is sub-
versive of all accepted principles.  The test of authority in an
agent of a municipality is not what may be conceived to be
beneficial to the corporation, but what are the bounds pre-
scribed by law within which his official conduct is limited.
The question must be resolved by the court in terms of power,
and not of policy.

In this case the bounds of official acts are circumscribed
and fixed by Ordinance No. 379.  *Gould* v. *Baltimore,* 120
Md. 534, 538.  Neither the municipality nor its representa-
tives may alter or change or ignore its mandatory provisions.

The power of the Mayor and City Council of Baltimore in this instance is a special and limited one, and must be "administered in the manner and according to the law creating it." *Barrickman* v. *Harford County,* 11 G. &. J. 50, 56; *Peter* v. *Prettyman,* 62 Md. 566, 571, 576; *Cumberland R. R. Co.* v. *Martin,* 100 Md. 167; *Baltimore* v. *Drum Point R. R. Co.* v. *Pumphrey,* 74 Md. 112; *Montgomery County* v. *Hudson,* 122 Md. 533; *Cummings* v. *Wildman,* 116 Md. 307, 315; *D'Esterre* v. *City of New York,* 104 Fed. 605, 610.

As was said by this Court in *Rushe* v. *Hyattsville,* 116 Md. 122, 126:

"The following statement from 1 *Dillon on Munic. Corp.,* 4th ed., sec. 89, is supported by practically an unbroken line of decisions: 'It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First. Those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. * * *

"It is equally well settled that any fair and reasonable doubt as to the existence of the power attempted to be exercised must be resolved against the corporation, and in such case the power must be denied."

These canons of construction are applied when the officials of a municipality procure money through the sale of its securities. *Mechem on Agency* (2nd ed.), sec. 1027, states that "an agent authorized to borrow may be and usually is limited as to the amount, time, security, rate of interest and the like, and often as to the person with whom he shall deal when he is so limited, and if the limitations are not simply secret instructions, the principal will not be bound when the authority is exceeded. (See section 763.) *Baltimore* v. *Eschbach,* 18 Md. 276, 282-283; *Baltimore* v. *Reynolds,* 20 Md. 1; *State* v. *Kirkley,* 29 Md. 85; *Horn* v. *Baltimore,*

30 Md. 218; *Baltimore* v. *Gill,* 31 Md. 375; *Baltimore* v. *Keyser,* 72 Md. 106; *Packard* v. *Hayes,* 94 Md. 233; *Baltimore* v. *Musgrove,* 48 Md. 272; *Mealy* v. *Hagerstown,* 92 Md. 741.

The vote was taken on the advisability of the city paying, not only the principal, but the interest rate, specified in the ordinance. The income yield is the truest common denominator of security values; and, aside from the credit of the debtor, the rate of interest is the most important factor in a sale of municipal bonds and stocks. The city assumed to pay the interest, and the faith and credit of the city were pledged not only for the security of the principal but also of the interest, which was an integral part of the debt.

In this connection, it should be borne in mind that there is a practical distinction between the nominal rate of interest and the actual rate of interest paid by the city on the stock. The first is the stipulated rate, and the second is the cost of the money to the city and is the result of the relation between the nominal rate and the amount of money realized by the city on the sale of the stock. The nominal rate and the actual rate are the same when the stock sell for par. When the five per centum stock sold for 96.517 in 1921, the actual rate of interest now paid by the city on the stock then sold is in excess of the nominal rate of five per centum. If it had sold for above par, the actual rate would have been less than the nominal rate. In other words, the city must pay what the money is worth at the time, no matter what is the nominal rate of interest fixed.

It is obvious that, under the Maryland decisions, the Mayor and City Council of Baltimore can have no implied power to change a rate of interest, that was enacted pursuant to an express power to fix the rate, granted by the statute and Ordinance No. 379, which are at once the source and the measure of all the city's power with respect to every share of city stock issued or to be isued under the Act of 1920.

There is another vital objection to Ordinance No. 159. Ordinance No. 379 directed the sale of the stock in various

denominations, bearing five per centum interest, and payable
at certain times, and there was no condition or restriction on
the sale with respect to the price at which the stock should
be sold.   Its value was to be determined by the market for
a security of its type and yield; and the proceeds were to be
applied as allotted by the ordinance.   Without any authority,
the city, by Ordinance No. 159, attempted another change
by providing that none of the stock, bearing the reduced rate
of four and one-half per centum, should be sold for less than
par.

The city sold the five per centum stock in 1921 for 96.517.
It will now probably sell above par, but what it will bring
in a few months or after a longer period is speculative.   It
is a well known fact that the prices obtainable for the same
security vary considerably within comparatively brief inter-
vals, and this customary course of the money market is a suffi-
cient reason to provide for a sale of the stock without any
limitation of price.

If the provision that the stock can not be sold at less than
par be sustained, the variation of the market might defeat
the public improvement now under way by the impossibility
of disposing of the stock in whole or in part.

Ordinance No. 159 undertook to put a restriction· on the
sale of the stock not provided for by the act.   The condition
that the stock should not be sold for less than par is a sub-
stantial inhibition, and practically puts a veto power in the
hands of any Mayor and City Council.   It would permit an
authorized issue of stock, at a marketable rate of interest,
to be made unsalable by future municipal officers resorting
to the simple expedient of lowering the rate of interest, and
providing that the stock should not be sold for less than par.

The Court has carefully considered the authorities cited
in briefs of the appellee, but, in the construction of an ex-
press statutory authority, no comprehensive rule is deducible
from the divergent statutes of the several states that will be
applicable to all cases.   An examination of ever so many deci-
sions will still leave each case to be determined upon the lan-
guage used in conferring the authority and the purposes for

which it is proposed to exercise that authority and the circumstances out of which the occasion for the issue arose. 2 *Dillon on Municipal Corp.* (5th ed.), sec. 883, p. 1360.

The general statement in the text in *McQuillin on Municipal Corporations,* vol. 5, sec. 2272, that "bonds may be made to bear a lesser rate of interest than that authorized by the vote of the people or otherwise," and to a somewhat similar effect in 28 *Cyc.* 1592, and 21 *Am. & Eng. Ency. of Law* (2nd ed.), 57, is not justified by *Omaha Natl. Bank* v. *City of Omaha,* 15 Neb. 333, 18 N. W. Rep. 63, and *Cleveland* v. *City Council of Spartanburg,* 54 S. Car. 83, 85, 31 S. E. 871, the two cases affording the basis for the text. Both these cases deal with the meaning of specific statutes, although there is nothing in the Nebraska case to indicate it. They should be considered as authoritive only with respect to the local laws of South Carolina and Nebraska, and the particular facts of each case. (See section 42 of chapter 13 of the Complied Statutes of Nebraska, as amended in 1883, pp. 823, 824; Acts of South Carolina, 1890, No. 651, sec. 4, pp. 976-978; 1896, No. 41, p. 88). The same is true of *Yesler* v. *City of Seattle,* 1 Wash. St. 308, 25 Pac. Rep. 1014 and 1016; Act of Washington, March 26, 1890, Session Laws, 1889-90, pp. 520-522. For these laws see *Metcalf* v. *Seattle,* 1 Wash. St. 297, as reported in 25 Pac. Rep. at pp. 1011 and 1012. On the other hand, the conclusion reached by this Court in this connection is supported by *Hillsborough County* v. *Henderson,* 45 Fla. 356, 33 So. Rep. 997; *State, ex rel Stanford* v. *School District,* 15 Mont. 133, 38 Pac. Rep. 462; *Skinner* v. *City of Santa Rosa,* 107 Cal. 464; *Mayor and City Council of Athens* v. *Hemerick,* 89 Ga. 674.

There is no doubt that the appellant had a right to institute these proceedings. *Baltimore* v. *Gill,* 3 Md. 375; *Montgomery County* v. *Henderson,* 122 Md. 534, 537, 538; *Rushe* v. *Hyattsville,* 116 Md. 122, 125, 127.

In conformity with the view of this Court, the decree must be reversed, and the cause remanded for further proceedings in accordance with opinion.

*Decree reversed, with costs to appellant.*

URNER, J., filed a dissenting opinion as follows:

The ordinance invalidated by the decision in this case declares "it is to the manifest interest of the Mayor and City Council of Baltimore and the citizens thereof, that the unsold portion amounting to thirteen million one hundred and ten thousand dollars ($13,110,000) of the General Improvement 1922-46 City stock shall bear interest at the rate of four and one-half per centum (4½%) per annum instead of five per centum (5%) per annum, provided said stock bearing interest at four and one-half per centum (4½%) per annum is sold at not less than its par value." The commissioners of finance were, therefore, directed by the ordinance to issue the remaining stock at four and one-half per cent. interest provided it was sold at not less than par. It is undisputed that the treasury and taxpayers of the city would be materially benefited by the sale of the stock at the lower rate of interest. The formal and responsible declaration of the municipal authorities to that effect is supported in the record by the unanimous opinions of experienced and prominent financiers, that the sale of city stock bearing four and one-half per cent. interest would be greatly to the advantage of the city, as enabling it to obtain the loans which the stock was to secure at a cost lower than its sale at a five per cent. interest rate would involve. The basis of this view is the belief that four and a half per cent. stock of the city would produce more than its par value at this time, and that the higher premium to be realized from the sale of five per cent. stock would not be sufficient to compensate for the additional interest charge, which would amount to more than $65,000 annually on the stock yet to be issued. In my opinion there is no adequate ground for denying to the city government the right to adopt the proposed method of duly conserving the financial interests committed to its care.

I think the provision for a five per cent. interest rate in the referendum ordinance should be regarded as having placed a maximum limitation upon the interest cost of the loan, and not as preventing the city from issuing the stock at a lower rate and for a price relatively more advantageous.

The authorization of the loan by the voters of the city included, in my judgment, an implied warrant to procure the specified sum of money as cheaply as possible within the limits of the terms which the ratified ordinance defined. I consider the effort of the city administration to protect the taxpayers by lowering the interest rate as not simply the exercise of a right but also as the performance of a duty.

Authority to make the loan at a lower interest rate than five per cent. is distinctly conferred by section 6, sub-section (25) of the City Charter, according to my understanding of its provisions. The section is entitled "General Powers," and the sub-section, "Stocks, Loans and Finance." By its first sentence the sub-section empowers the Mayor and City Council to "levy upon the assessable property within the city, and collect by tax any sum which may be necessary to pay and discharge the principal and interest of any loan which may heretofore have been obtained, or which may hereafter be obtained by said city according to law," and by its concluding clause it provides that "nothing herein contained shall prevent said city from negotiating said loans, or any part thereof, already authorized by law, but not yet actually issued, or which may be hereafter created and authorized by law, at a lower rate of interest than five per cent. per annum, whenever it may appear to the said city practicable and advisable to do so." Except for the clause last quoted, the first sentence of sub-section (25) might have been construed as requiring the city to provide by taxes for the payment of interest on subsequently issued loan stock at the rate originally prescribed, and as thus preventing a reduction of the rate. But the final sentence precludes such an interpretation, and in effect approves the policy of sound finance and practical economy which the ordinance in question was designed to apply. As sub-section (25) relates to the payment of the principal and interest of the stock involved in this case, I can see no valid reason why its proviso as to the lowering of the interest rate should not be held to have a similar relation. In declaring that nothing therein

contained shall prevent the city from reducing the rate of interest, if feasible, on stock thereafter issued, the Legislature appears to have assumed that, apart from the preceding clauses which the proviso qualified, there could be no doubt as to the right of the city to thus avoid unnecessary expense.

The sub-section was enacted as an integral and important part of the New City Charter. Its provisions are significant and definite expressions of legislative purpose. They were in force when the ordinance was submitted to the voters, and their approval was presumably given with due regard to the policy which the charter indicated as to the lowering of the interest rate on future stock issues, if practicable in the city's judgment.

The requirement of the ordinance that the four and one-half per cent. stock be sold for at least its par value should not present any difficulty. It prescribed a condition upon which the exercise of the authority vested by the ordinance in the finance commissioners was made dependent. If they were unable to sell the stock at par, the advisability of offering a higher interest rate, not exceeding five per cent., would be demonstrated. In that event the stock could be reoffered under a new ordinance or under the one by which the interest rate was first determined. The just presumption is that the municipal government would not permit the loan to fail merely because the stock could not be sold at par on the lower interest basis, but would properly discharge its obligations to the people, in reference to the loan, within the limitations of the authority which they have granted.

*On motion for reargument*: In overruling the motion of the appellee for reargument, the majority of the members of the Court concurring in the opinion desire it to be noted that the effect of the Court's opinion is to be confined to the facts of the instant record; and that no opinion is expressed by the majority of the Court as to the effect of submitting to the voters, under a similar enabling act, the question of the issuance of portions of the total authorized issue of stock by one or more ordinances.

*Motion for reargument overruled.*