## CITY OF BALTIMORE *v.* NATIONAL CAN CORPORATION

[No. 53, October Term, 1955.]

*Decided December 8, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON, and HAMMOND, JJ.

*William H. Marshall,* Assistant City Solicitor, with whom were *Thomas N. Biddison,* City Solicitor, and

*Edwin Harlan,* Deputy City Solicitor, on the brief, for appellant.

*Milton Mallin* and *Herbert M. Brune, Jr.,* with whom were *Brune, Perkins & Rich, Irving H. Goldberg* and *Goldberg, Weigle, Mallin & Rivkin* on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

National Can Corporation, a Delaware corporation, brought this suit in the Superior Court of Baltimore City against the Mayor and City Council of Baltimore to determine the rate at which plaintiff must reimburse the City for interest on the sum of $3,200,000 borrowed by the City for plaintiff's port facility under a port development contract. The Court, accepting plaintiff's contention, entered a judgment declaring that the actual interest cost on the bonds was at the rate of approximately 2.341% and that this is the interest rate payable by plaintiff. The City, appealing from that judgment, claims that plaintiff should pay at the rate of approximately 3.187% so that the City can pay the bondholders at the rate on the coupons.

Under an Act of the Maryland Legislature, which took effect as an emergency measure upon its approval by Governor McKeldin on March 24, 1951, the Mayor and City Council of Baltimore was authorized to create an agency of seven members to be known as Port of Baltimore Commission; to transfer to that Commission all authority that had been vested in the Port Development Commission; and to issue and sell bonds to an amount not exceeding $30,000,000, the proceeds to be used by the Commission in extending, developing and improving the harbor of Baltimore. Laws 1951, ch. 201.

In pursuance of that Act, the Mayor and City Council adopted Ordinance No. 1613, approved April 4, 1951, authorizing the Commissioners of Finance, upon the recommendation of the Port of Baltimore Commission and the approval of the Board of Estimates, to issue bonds to an amount not exceeding $12,000,000, the proceeds

to be used for extending, developing or improving the harbor of Baltimore and its facilities; but subject to the approval of a majority of the voters of the City. The ordinance was approved by the voters at the municipal election on May 8, 1951. On June 19, 1951, the City created the Port of Baltimore Commission and conferred upon it the powers authorized by the Legislature.

On September 23, 1953, the Mayor and City Council, acting upon the recommendation of the Port of Baltimore Commission and the approval of the Board of Estimates, entered into the contract with plaintiff to provide $3,200,000 from the sale of municipal bonds to enable plaintiff to purchase land adjacent to its manufacturing plant along the Patapsco River and to construct thereon marginal wharfage, storage and warehousing facilities. By that contract plaintiff agreed to convey the property to the City and the City agreed to lease the property to plaintiff. Plaintiff agreed to reimburse the City for (1) all expenditures made in connection with the project; (2) all interest, redemption and other charges paid or to be paid by the City on or in connection with all funds borrowed by the City and expended in connection with the project; and (3) all estimated real estate taxes which the City will lose as a result of its acquiring the property for the project. The contract also provided that the parties would agree upon a schedule of maturities for the bonds to be arranged so that they would mature serially and the annual maturities would become progressively larger in order that the annual debt service would be approximately constant.

It was originally planned to open bids for the bonds on January 26, 1954; but, according to the testimony of City Treasurer John J. Ghingher, bond counsel in New York refused to give a favorable legal opinion on such bonds because of the fact that the contract provided that the ownership of the property would revert to plaintiff at the end of the term of the lease. It was accordingly decided to modify the contract so that the property would

continue indefinitely in the name of the City and plaintiff would hold it under a long-term lease.

At that time the Commissioners of Finance were preparing to offer 11 other bond issues for various municipal purposes on March 30, 1954, and the question arose whether it would be advisable to offer the harbor bonds along with the other issues. It was the consensus of opinion of New York and Baltimore bankers that it would be advantageous to offer all 12 issues at the same time. Upon plaintiff's request, the Commissioners accordingly decided to offer the harbor bonds along with the other issues. It was known that in the municipal bond market the interest cost of bonds having the same investment merit varies with the maturity of the bonds, and that it is lowest for the short-term bonds and increases as the maturities increase.

The Commissioners advertised for sealed bids, to be opened on March 30, 1954, for $36,050,000 of its general obligation bonds, comprising the harbor bonds totaling $3,200,000 and the bonds of the other 11 issues. The Commissioners required each bidder to specify not only the coupon rate of interest to be paid on the bonds, but also the actual interest cost on each issue. They reserved the right to reject any or all bids.

There were only two bidders, a syndicate headed by the Chase National Bank and a syndicate headed by Halsey, Stuart & Company. The bids were opened by the Commissioners in the City Treasurer's office in the City Hall in the presence of representatives of plaintiff, representatives of the syndicates, the Director of the Port of Baltimore Commission, the City Solicitor, the Deputy City Solicitor, and the Deputy Comptroller. Each bid was for all 12 issues or for none. The Chase syndicate bid an interest cost of 2.341%. The Halsey, Stuart & Company syndicate bid an interest cost of 2.379%.

The City Treasurer announced that the Chase bid was the most advantageous for the City. Counsel for plaintiff called attention to the fact that plaintiff was assured that if the bonds of all 12 issues were sold together, it

would not be charged more than the overall interest rate. The City Treasurer assured plaintiff's counsel that the rate on the coupons of the harbor bonds did not represent the actual interest cost on those bonds, for if they had been sold separately the interest rate, on account of their average shorter maturities, would be not more than 2.431%. Plaintiff's counsel requested a supplementary agreement assuring that the interest rate would not be more than 2.341%, otherwise plaintiff would request that both bids be rejected and the harbor bonds be advertised separately. The City Treasurer promised to recommend such an agreement, subject to the approval of the City Solicitor. He then consulted the City Solicitor, who advised that the City should not execute such an agreement at that time, but that the question of the interest rate should be deferred. Plaintiff's counsel again requested that the bids be rejected, and that, if the City were unwilling to reject them, the award should at least be postponed for several days pending efforts to reach an agreement. The Commissioners, however, upon the advice of the City Solicitor, decided to make an immediate award to the Chase syndicate.

The Chase syndicate immediately reoffered the bonds and sold them at prices which produced yields ranging from .9% for the bonds maturing in 1956 to 2.95% for the bonds maturing from 1985 to 1990.

In spite of the uncertainty that had arisen as to the amount of rent to be paid by plaintiff, the City nevertheless paid out of its general funds the sum of $323,-206.21 for the purchase of the real estate, for engineering, and for other costs; and in May, 1954, plaintiff entered into a contract with Consolidated Engineering Company for the construction of the improvements specified by the contract.

On June 23, 1954, the City Solicitor explained at a joint meeting of the Commissioners of Finance and the Board of Estimates that he had taken the position that the City could not legally accept from plaintiff reimbursement at the average interest rate on all 12 issues,

but that if the Court should decide to the contrary, the Board might enter into a supplementary agreement approving the overall interest rate. Thereupon the City Treasurer offered the following resolution:

"Resolved, That the City and National, in entering into the contract on March 10, 1954, mutually intended that National's interest charges would be no larger than the minimum required by the Port Development Enabling Act and Ordinances, that is, the actual interest cost to the City.

"And be it further resolved, That if it were within the powers of the City, under the aforesaid Port Development Enabling Act and Ordinances, to include a specific provision in the contract with said National Can Corporation calling for the application of the overall average interest cost, the City is prepared to enter into a supplementary agreement with the National to add such provision for interpretation to the contract at this time."

The resolution was unanimously adopted by the Board of Estimates and the Commissioners of Finance at their joint meeting.

The City contends that, regardless of the intention of the Board of Estimates and the Commissioners of Finance, the contract, following the language of the Port Development Act of 1951, provides that plaintiff shall reimburse the City not only for all expenditures of money made in connection with this project, but also for "all interest * * * paid or to be paid by the City on or in connection with all funds borrowed by the City and expended in connection with this project." The City says that the ordinance approved on April 4, 1951, authorizing the Mayor and City Council to issue bonds to an amount not exceeding $12,000,000, directs that a sum sufficient to pay the interest on any outstanding bonds as well as the principal of current maturing series shall be collected annually by taxation; and that it was the

intention of the Mayor and City Council, when it entered into the contract with plaintiff on September 23, 1953, that the loan of $3,200,000 to plaintiff would be liquidated entirely by payments made by plaintiff; and, to accomplish this, plaintiff should pay at the rate indicated on the coupons, which would produce over $487,000 more than the rate approved by the Commissioners of Finance and the Board of Estimates.

We must recognize, however, the distinction between nominal rate of interest and actual rate of interest, as this Court clearly stated in *Stanley v. City of Baltimore,* 146 Md. 277, 301, 126 A. 151. In the opinion in that case Judge Parke said:

> "In this connection, it should be borne in mind that there is a practical distinction between the nominal rate of interest and the actual rate of interest paid by the city on the stock. The first is the stipulated rate, and the second is the cost of the money to the city and is the result of the relation between the nominal rate and the amount of money realized by the city on the sale of the stock. The nominal rate and the actual rate are the same when the stock sell for par. * * * If it had sold for above par, the actual rate would have been less than the nominal rate. In other words, the city must pay what the money is worth at the time, no matter what is the nominal rate of interest fixed."

In the instant case the bidders set the coupon rate high on short-term issues so as to sell at a premium, and low on long-term issues so as to sell at a discount. The bidders set the coupon rate at 5% for the issues maturing from 1956 to 1971, so as to yield from .9% to 2.1%; at 2¼% for the issues maturing from 1972 to 1976, so as to yield from 2.05% to 2.3%; at 2⅜% for the issue maturing in 1977, so as to yield 2.35%; at 2½% for the issues maturing from 1978 to 1984, so as to yield from 2.4% to 2.6%; and at 1% for the issues

maturing from 1985 to 1990, so as to yield 2.95%. The City agreed to these coupon rates.

It is clearly understood that if the harbor bonds had been sold separately, they would have had an interest rate of not more than approximately 2.341%, because the average maturity of these bonds is only 18 years, while the average maturity of all 12 issues is 22 years. To fortify this position, plaintiff produced J. Creighton Riepe, an investment banker, who has been specializing in municipal bonds for more than twenty years. Mr. Riepe testified that there was absolutely no difference in the relative investment merit or desirability of the bonds in all 12 issues, inasmuch as all are general obligations of the City of Baltimore having the same security and other characteristics. The average interest rates set out for the bonds in the individual issues were purely nominal bids and did not represent the actual cost of borrowing the sums represented by the individual issues. We therefore construe the provision in the ordinance and the contract for reimbursement of "all interest * * * paid or to be paid by the City" to be fulfilled by payment of the average interest cost which the City must pay, not on the harbor issue alone, but on all 12 issues. The declaratory judgment entered in the Court below will accordingly be affirmed.

The City makes the additional contention that if the Court of Appeals sustains the judgment of the Superior Court, and the City must accordingly levy taxes to make up the difference between the amount it must pay to the bondholders at the coupon rate and the amount it receives from plaintiff, the tax burden ought to be spread over the entire period of the loan in as equal a manner as possible so that the taxpayers in the early years will not be burdened more than the taxpayers in the later years. As that fiscal problem was not raised by the pleadings in this case and was not decided by the Court below, we need not consider it here. Rules of the Court of Appeals, rule 9

*Judgment affirmed, with costs.*