J. PEMBROKE THOM *v.* MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

[No. 100, October Term, 1927.]

*Decided February 2nd, 1928.*

The cause was submitted on briefs to BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Wallis Giffen,* for the appellant.

*A. Walter Kraus, City Solicitor,* and *Allen A. Davis, Assistant City Solicitor,* for the Mayor and City Council of Baltimore, appellee.

*Venable, Baetjer & Howard,* for the Mercantile Trust and Deposit Company, appellee.

OFFUTT, J., delivered the opinion of the Court.

The General Assembly of Maryland, by chapter 560 of the Acts of 1920, authorized the Mayor and City Council of Baltimore "to issue its stock to an amount not exceeding fifty million ($50,000,000) dollars, said stock to be issued from time to time and payable at such times and bearing such rate of interest as the said Mayor and City Council of Baltimore shall by ordinance prescribe. The proceeds of the sale of said stock shall be used for the purposes of this act in such

manner as may be provided by ordinance of the Mayor and City Council of Baltimore. The certificates of stock shall not be issued unless or until the ordinance which the Mayor and City Council of Baltimore is hereby authorized to pass for the purpose aforesaid, shall be approved by a majority of the votes of the legal voters of the City of Baltimore cast at the time and place named in said ordinance."

The Mayor and City Council of Baltimore, by Ordinance No. 380, known as "The Port Development Loan Ordinance," adopted in pursuance of that act, provided for an issue of serial stock bearing interest at five per cent., and payable in fixed annual instalments over a period of forty years, which ordinance contained these provisions:

"That the said stock shall bear interest at the rate of five per centum (5%) per annum during the respective periods that the series in which it is issued may run and that the said interest shall be paid semi-annually on the first day of May, and the first day of November, in each year. * * *

"And be it further ordained, that a sum sufficient to meet the interest on any outstanding stock, as well as the principal of the current maturing series of said stock shall be annually collected by taxation, and that a rate sufficient to produce said sum shall be levied in each year upon every one hundred dollars' worth of assessable property in the City of Baltimore, and in the proper proportion for any greater or less amount."

That ordinance was submitted to and approved by the legal voters of the City of Baltimore at an election held on November 2nd, 1920.

Chapter 155 of the Acts of 1927 attempted to authorize the Mayor and City Council of Baltimore "to provide by ordinance or ordinances, whenever it may appear practicable and advisable to do so, for negotiating its loans, evidenced by bonds, stocks or certificates of indebtedness, or any part thereof heretofore or hereafter authorized by the General Assembly of Maryland and approved by the voters pursuant to ordinance, but not yet actually issued, at a rate of interest per

annum less than that which may have been provided for in any ordinance or ordinances submitting such loans to the voters for their approval."

By Ordinance No. 104, adopted September 20th, 1927, the Mayor and City Council of Baltimore ordained "that the Commissioners of Finance in the issuance of ten million dollars ($10,000,000) of the fifty million dollars ($50,000,000) Port Development Loan, authorized by chapter 560 of the Acts of 1920 (which ten million dollars ($10,000,000) was submitted to and approved by the voters pursuant to Ordinance No. 380, approved July 6, 1920), shall issue the same at the rate of four per centum (4%) per annum during the respective periods for which the series of the said ten million dollars ($10,000,000) may run instead of at five per centum (5%) per annum as provided in section 2 of Ordinance No. 380, approved July 6, 1920, and said interest at four per centum (4%) per annum shall be payable semi-annually on the first day of May and the first day of November in each year" and "that so much of section 2 of Ordinance No. 380, approved July 6, 1920, which provides that the series of said ten milion dollar loan shall bear interest at five per centum per annum during the respective periods of said series be and the same is hereby repealed."

Subsequently the Commissioners of Finance of the City of Baltimore invited bids for the purchase of $2,000,000 of the $10,000,000 issue referred to in Ordinance No. 380, maturing serially and bearing interest at four per cent., and the Mercantile Trust & Deposit Company and others bid $100.913 for each $100 par value of "all or none" of the proposed issue. Thereupon the appellant in this case filed, in the Circuit Court of Baltimore City, a bill of complaint, in which he prayed the court to restrain the proposed sale on the ground that the appellee had no authority to issue or sell the stock in the form proposed, because such issue or sale in that form had not been submitted to or approved by the legal voters of Baltimore City as required by article 11, section 7, of the Constitution of Maryland. The matter was heard and submitted on a case stated, and the trial court ruled that

the proposed issue of stock was valid, and refused the injunction. This appeal is from that decree.

The sole question presented by the appeal is whether the Mayor and City Council of Baltimore, acting under a power granted by the Legislature of Maryland, can validly change the rate of interest specified in an ordinance submitting to the legal voters of Baltimore City for their approval or rejection a proposed issue of bonds, stocks, securities, or other obligations of the City of Baltimore.

The answer to that question depends upon the meaning to be given the word "debt," as used in section 7, article 11, of the Constitution of Maryland, which in part provides that "no debt (except as hereinafter excepted) shall be created by the Mayor and City Council of Baltimore; nor shall the credit of the Mayor and City Council of Baltimore be given or loaned to, or in aid of any individual, association or corporation; nor shall the Mayor and City Council of Baltimore have the power to involve the City of Baltimore in the construction of works of internal improvement, nor in granting any aid thereto, which shall involve the faith and credit of the City, nor make any appropriation therefor, unless such debt or credit be authorized by an Act of the General Assembly of Maryland, and, by an ordinance of the Mayor and City Council of Baltimore, submitted to the legal voters of the City of Baltimore, at such time and place as may be fixed by said ordinance, and approved by a majority of the votes cast at such time and place."

In construing that provision it should be so interpreted as to allow the municipal authorities the widest measure of freedom necessary to the efficient discharge of their duties, but which is nevertheless consistent with its mandate, but the courts are not at liberty to go beyond that, and to give to it a meaning inconsistent with its language, to gratify some demand of expediency or convenience. It may well be inferred that it is reasonable and necessary that the municipality should have some freedom of choice and change in fixing the interest rates which it will pay for money, and such a privilege may indeed be essential in marketing its

securities to the best advantage, but if that freedom is abridged by constitutional prohibitions the remedy is to amend and not to overrule the Constitution. This precise question does not appear to have arisen in this form in this court prior to this case, although the principles upon which it depends were considered in the case of *Stanley v. Baltimore,* 146 Md. 277. In that case it appeared that the Legislature, by chapter 373 of the Acts of 1920, "authorized the Mayor and City Council of Baltimore to issue its stock to an amount not exceeding twenty-six million dollars for various municipal activities, the submission of an ordinance for that purpose to the legal voters of Baltimore City, and the enactment of an ordinance for the expenditure of the proceeds of the sale of stock by a special commission." Pursuant to the authority contained in that act, an ordinance was prepared submitting to the legal voters the question of approving or rejecting the loan, and which specified the rate of interest at five per cent., and that ordinance was passed and approved by a majority of the voters. Subsequently the Mayor and City Council by another ordinance changed the interest rate to four and one-half per cent., and the question was whether the municipality had the power to make that change, and it was held that it had not. While the decision turned immediately upon the question of whether the Legislature had granted to the municipality the right to make the change after the ratification of the ordinance, it ultimately rested upon the constitutional provision to which we have referred, because the statute declared that the submission of the question as provided by it was required by the constitutional provision referred to.

Chapter 373 of the Acts of 1920 provided for the issue of certain stock "to be issued for such amounts and to be payable at such times and to bear such rate of interest as the Mayor and City Council of Baltimore shall by ordinance provide; but no stock shall be issued in whole or in part unless the ordinance of the Mayor and City Council of Baltimore providing for the issuance thereof shall be submitted to the legal voters of Baltimore City at such time

and place as may be fixed by said ordinance and be approved by a majority of the votes cast at such time and place as required by section 7 of article 11 of the Constitution of Maryland."

A comparision of the two acts will show them to be substantially identical in their relation to the question in issue in this case, and in that case it was held that, since the ratifying ordinance specified the rate of interest on the whole loan, that it had exhausted the entire power granted to the municipality by the enabling act, and that it could not thereafter change the rate of interest specified in the ordinance. With respect to that the court, in *Stanley v. Baltimore, supra,* said: "The court is, therefore, of the opinion that chapter 373 of the Acts of 1920 did require the city to determine the amount of the issue of stock, the rate of interest it should bear, and the times when it should become payable, by an ordinance which was to be submitted to the voters. In this view of the act, Ordinance No. 379 must comply with these exactions. * * * Ordinance No. 379 became a law, and, with respect to those matters covered by the ordinance, the city's power of legislation under chapter 373 was at an end, having been exhausted in its exercise."

If it was necessary in that case to state in the ordinance in either general or specific terms the rate of interest, then it was necessary to state it in the ordinance involved in this case, for in that respect chapter 373 cannot be distinguished from chapter 560 of the Acts of 1920.

But the contention of the appellee is that, whether that is so or not, nevertheless the Legislature had the power to change the interest rate specified in Ordinance No. 380, or in any other ordinance, on unissued stock, or to delegate to the municipality the power to make such change. But whether it had any such power must depend upon the meaning to be given the word "debt" as used in the constitutional provision quoted above. For if the interest on the issue of stock authorized by Ordinance No. 380 is a part of the debt to be incurred under the authority of that ordinance, manifestly the Legislature had no power mediately or immediately to change

the rate specified in it, for that would be to authorize a debt different in amount from that approved by the voters. Const., art. 11, sec. 7. And in respect to that question it was said in *Stanley v. Baltimore, supra*: "The city assumed to pay the interest, and the faith and credit of the city were pledged not only for the security of the principal but also of the interest, which was an integral part of the debt." Certainly if, as stated in that case, the interest is an "integral part of the debt," it is difficult to see how, in the face of the constitutional guaranty, the Legislature can itself or by a delegate change the rate of interest specified in the ratifying ordinance without changing the amount of the debt, or without authorizing a different debt from that approved by the voters, and, unless we are to overrule that case, we must hold Ordinance No. 104 invalid. Whether interest is or is not a part of the principal debt seems to have depended to some extent upon the nature of the case in which the question has arisen, and it has been decided both ways. In *Epping v. City of Columbus*, 117 Ga. 263, the question involved was the validity of an issue of school bonds, and it turned on the meaning of the word "debt" as used in a provision of the state constitution limiting the debt which a municipality might incur. In that case, following what is undoubtedly the weight of authority in such cases, the court held that interest was no part of the principal debt. But in *Central Bank & Trust Company*, 139 Ga. 54, in construing a statute under which the state claimed certain interest, it was held that the term debt as used in the statute embraced interest as well as principal, and to the same effect is a statement in note 1, page 1372, 17 C. J. In the case last cited it is not clear whether the court referred to earned interest, which is usually held to be a part of the debt, or to unearned interest, which is generally held not to be a part of the debt. But in *State etc. v. Lister*, 91 Wash. 9, in construing the word "debt" in a constitutional limitation upon the power of the state to borrow money, the court held that it included unearned interest, although that case may be distinguished on the ground that principal and interest were payable out of different

funds. But aside from these authorities, if any force is to be given the rule of *stare decisis,* we are constrained to regard the question as settled by *Stanley v. Baltimore, supra,* which held that the word "debt", as used in section 7, article 11, Const. of Md., does include interest, where by the express terms of the ratifying ordinance the rate is specified, the periods at which it is payable named, and provision made for levying taxes for its payment.

From what has been said it follows that in our opinion the injunction prayed by the appellant should have issued, and the decree denying it was erroneous and must be reversed.

> *Decree reversed, and cause remanded for further proceedings in accordance with the views expressed in this opinion.*

---

BOND, C. J., filed the following dissenting opinion, in which URNER and ADKINS, JJ., concurred:

The General Assembly and the city government have, of course, complete control over the city and its affairs except to such extent as they may be restrained by constitutional provisions. *Groff v. Frederick,* 44 Md. 67, 78; *Pumphrey v. Baltimore,* 47 Md. 145, 152. And their enactments are presumed to be valid, and must be accepted as such until some conflict with the constitution clearly appears; and when there remains doubt of the existence of a conflict the enactments must be left standing. *Hagerstown v. Sehner,* 37 Md. 180, 190; *Davis v. Helbig,* 27 Md. 452, 462; *Miller v. State,* 124 Md. 385, 389; *McCurdy v. Jessup,* 126 Md. 318. The constitutional clause to be considered here, article 11, section 7, merely requires that no debt shall be created by the city unless it be authorized by an act of assembly, and by an ordinance submitted to popular vote and approved by a majority of voters. This, it is contended, denies the Legislature and the city government power to reduce the rate of interest on an issue of city stock for a debt previously authorized at the higher rate specified in an ordinance submitted to vote, unless a popular vote is taken on the reduced rate, too. And

two arguments have been advanced in support of the contention.

It is argued by the appellant that this constitutional clause requires that *the ordinance* for the issue of stock be submitted and approved by popular vote, and that everything which may be included in an ordinance so submitted and approved, being founded on the constitutional requirement, must have a constitutional force and effect beyond change by legislation or ordinance alone. But, assuming that the clause does require submission of an ordinance rather than some simpler form of proposal for the debt, the argument seems to me to be untenable because the constitutional clause has a limited purpose, its requirement must be limited to that purpose, and it cannot reasonably be construed to lend constitutional force or effect to anything and everything which the city may include in a loan ordinance. It must be confined in its effects to that which is inserted in compliance with the constitution and in effectuating its purpose, whatever that may include. It is customary for ordinances for municipal loans to embody many specifications of the securities which it is planned to issue, specifications not only of the interest rates, but of all such details as the denominations, division into classes, sinking fund arrangements, arrangements for application of rentals from leased improvements, and the like. There is no mortgage or other instrument to embody these specifications for a public loan, and the ordinance is used for the purpose, for fixing rights and duties in detail. It seems questionable whether it can reasonably be said that all of such a comprehensive ordinance is ever submitted to popular vote, or that the popular judgment or wish is taken on all these details and specifications. But assuming that the whole ordinance, with all that it contains, is submitted to vote, then it seems to me a mistake to say that any item included beyond the purpose and requirement of the Constitution can derive force and effect from any source greater than that which caused the insertion of the particular item. A referendum on the interest rate or on any other detail of the stock issue, if not required by the Constitution, could not upon any principle

that I can think of have any standing or position beyond the control of the Legislature and the city government.

Therefore I take the question in the case to be, finally, one of the meaning or scope of the constitutional requirement that the "debt" be authorized and approved. Does it require authorization and approval of the particular interest rate as part of the authorization and approval of the debt, by act of assembly, ordinance and popular vote? I agree that if it does, then, after a specific rate has been authorized and approved, a new rate cannot be fixed except by the same triple authorization, and that the Act of 1927, ch. 155, and the ordinance in pursuance of it, which attempt to provide for the issue at a reduced rate of stock previously authorized at a higher rate, are invalid for want of approval by the popular vote. But I have not been able to agree that the Constitution does require authorization or approval of the interest rate.

The word "debt" alone, it seems to me, does not solve the problem. As commonly used it does not always and necessarily include the interest on the principal of an indebtedness. I believe it is common to speak of the principal only of a governmental indebtedness as the national, state or municipal debt. It is true that differences in interest to be paid on debts may make differences in the total obligation and burden to be borne ultimately by the taxpayers, but that total may also be affected in some degree by the prices at which the bonds or stock are put out, by sinking fund arrangements, arrangements for the application of rentals from leased improvements, and other incidents settled upon for loans, and I believe it will be agreed that the Constitution does not require all these incidents or details to be fixed in the approval of the debt; so the effect on the total ultimate obligation and burden of taxation would not alone justify construing the authorization and approval of debt in this clause to include approval of the particular interest rate.

This constitutional requirement was adopted at a time when nearly all the states in the country were placing re-

strictions upon the too easy incurring of municipal debts, and it seems to me there is significance in the fact that, in those jurisdictions in which the restriction is against exceeding specified limits of total debt, it has generally been held that, in applying the limitations, interest to accrue is not to be counted in as part of the debt. *Dillon, Mun. Corp.*, sec. 205; 2 *Abbott, Mun. Corp.*, sec. 160; 5 *McQuillin, Mun. Corp.*, sec. 2224; *Simonton, Mun. Bonds*, secs. 51 and 57. This was settled by a decision of Justice Miller of the United States Supreme Court, sitting on circuit, in *Durant v. Iowa County*, 1 Woolw. 69, Fed. Cas. No. 4189, as early as 1864, three years before the adoption of the Maryland constitutional clause we are now construing. The restricting clause in those other states is not the same as the Maryland clause, but the general purpose is the same, and the conception of the debt restrained seems to me likely to have been the same. "The lawmakers were not looking at the incident of the indebtedness, but to the indebtedness proper." *Ashland v. Culbertson*, 103 Ky. 161, 164.

The choice of a particular rate of interest, a matter of seldom more than one per cent. one way or the other, seems to me comparatively so unimportant that it is not likely it would be made the subject of regulation or restraint under a constitutional clause, and still less likely does it seem that framers of the constitution would require that the choice he made as part of the authorization and approval in an act of assembly and an ordinance, and by a popular vote, all three. The framers knew that these three steps would take time, often a large part of a year, and that, as to stock to be issued in instalments, years might intervene before all stock authorized as they required would actually be put out; and they knew, too, that the rates at which securities could be marketed were, and always would be, unstable, variable, quantities. Variations such as those after the late European War, to which the city and the Legislature have attempted to make some adaptation in the present instance, were not things unheard of by the framers of the Constitution of 1867; on the contrary, within their experience, the interest rate was a much

more unstable element than we now ordinarily conceive it to be. Within thirty years prior to 1867, there had been six financial panics or crises, and, within the thirteen years prior, four wars in Europe and the Civil War in America, all of which had their effects on the interest rate; and there were no arrangements of importance for stabilizing the rates then. This variable nature in the rate seems to me to argue against any intention on the part of the framers to have it fixed for an issue of municipal securities through the triple process prescribed for authorizing a debt, or to restrict the freedom of the municipality at all in arranging the rate. Again, I think the long continued practice of the Legislature to authorize a debt without specifying any rate of interest furnishes a strong argument against construing the Constitution to require it as any part of the authorization. It seems to me clear, to repeat, that if the particular rate of interest is required by the Constitution to be settled by popular vote, it must be settled also in the act of assembly and in the municipal ordinance, and, on the other hand, if it is not required to be settled in the act of assembly, it is not required to be settled in the ordinance or by the popular vote—not required by the Constitution, that is, for, of course, it must as a practical necessity be settled by some agency in order to prepare the securities. The requirement of the Constitution is single, that "the debt" shall be authorized by an Act of the General Assembly of Maryland, and by an ordinance of the Mayor and City Council of Baltimore, submitted to the legal voters, etc. One and the same thing is to be acted upon by all agencies alike, and I do not see any escape from the construction that whatever is included in the authorization or approval of the debt by any one must be included alike in the act of assembly, the ordinance and in the question voted on, and that if the Constitution requires that a particular rate of interest be voted on, or gives any effect to a vote on the rate binding the Legislature and the city government, then the Constitution equally requires that the act of assembly shall settle the particular rate in authorizing the debt. But certainly the legislative practice has been against that construc-

tion; the Legislature has not treated the interest rate as an integral part of the debt, to be settled in authorizing the debt under the Constitution. In only a few of the acts passed in compliance with the Constitution has any interest rate been specified. In by far the greater number, nearly forty, the selection of the rate has been referred entirely to the city itself. Illustrations of this are found in these acts: 1870, ch. 303; 1892, ch. 138; 1894, ch. 149; 1896, chs. 350 and 370; 1898, ch. 444; 1900, ch. 152; 1901, ch. 19; 1902, chs. 246 and 333; 1904, chs. 274, 338 and 468; 1906, ch. 728; 1912, ch. 27; 1914, ch. 722; 1916, ch. 585; 1920, chs. 373 and 374; 1922, ch. 379; 1924, ch. 222; 1927, chs. 154, 328, 332, 431, 470 and 471. In some of the acts authorizing smaller loans no reference at all has been made to interest; as to that element the particular acts of assembly have given no authorizations. The whole of the first act passed under the constitutional clause, Acts 1868, ch. 36, was: "Be it enacted by the General Assembly of Maryland, that the Mayor and City Council of Baltimore be, and they are hereby authorized, to issue from time to time, as they may deem proper, the bonds of said Mayor and City Council, payable at such time and for such sums as they may deem proper, not exceeding the sum of fifty thousand dollars in any one year, and in the whole not exceeding the sum of one hundred thousand dollars, for the improvement of the public parks of the said city, the authority now given being that required by the seventh section of article eleven of the Constitution of this State, to enable the said Mayor and City Council to make appropriation at their discretion within the above limits for the purpose aforesaid." And an Act of 1882, ch. 61, enacted no more than, "That the Mayor and City Council of Baltimore be and they are hereby authorized and empowered to pass the necessary ordinances and to issue the bonds of said city to an amount not exceeding two hundred thousand dollars for the extension of Patterson Park." See Acts 1874, ch. 477; 1878, ch. 265; 1904, ch. 444. The acts passed in 1924 and 1927 to authorize loans by the city, twelve in number, provided for interest "at such rate or rates as may be

provided by or under the authority of said ordinance," thus not even directing that the rates be specified in the ordinance or question submitted to vote. The earlier of these acts were passed at a time when the purpose of the constitutional clause was still well known, apparently no question of their constitutional sufficiency ever arose, and they seem to furnish cogent arguments against an intention to require that a particular rate of interest be fixed in fixing the amount of debt authorized. "We allude to this legislation," said this court in *Baltimore v. State,* 15 Md. 376, 457, "as evidence of contemporaneous construction, and acquiescence by the people, and the various departments of the government, in such practical interpretation. For the effect of such continued practice, see *Burgess v. Pue,* 2 Gill, 11; *State v. Mayhew,* 2 Gill, 487; * * * See also *Bradford v. Jones,* 1 Md. 351, that the Constitution may receive an interpretation from a long, constant, and uniform legislative practice. * * * Is it not as important that the interpretation of the fundamental law should be as uniform and certain as that of legislative enactments? In both the intent of the authors is the point to be arrived at, and the same rules and means of ascertaining it may be resorted to. If such considerations do not establish the right of the Legislature * * *, they are well calculated to raise very serious doubts on the subject, in which state of the judicial mind the law must be left to operate, until changed by the proper branch of government." *Catholic Cathedral v. Manning,* 72 Md. 116, 130; *Levin v. Hewes,* 118 Md. 624, 641, The court may obtain from any authentic source its information on such practice for aid in construction. 2 *Sutherland on Statutory Construction* (2nd ed.), secs. 471 to 473. *Sedgwick, Interp. & Construction Statutory and Constitutional Law* (2nd ed.), pp. 215 to 217. *Smith, Comm. on Statutory and Constitutional Construction,* secs. 622 to 623.

A legislative construction particularly apposite to the consideration of the Act of 1927, now questioned, seems to me to be found in a provision in an act of 1880 (chapter 94), that stock already authorized but not yet actually issued, or stock thereafter created and authorized by law, might be

negotiated at a reduced rate whenever it might appear to the city practicable and advisable to do so. That act was apparently one of the measures adopted to take advantage of the lowering of rates of interest in that more settled period. Under Acts of 1861-1862, ch. 83; 1866, ch. 38, and 1868, ch. 467, "Baltimore Water Stock" had been issued at six per cent., with a right of redemption reserved. An Act of 1876 (chapter 237) provided for the issue of redemption stock at a reduced rate, not to exceed five per cent., with a clause for payment by the city of taxes on the stock. The Act of 1880, ch. 94, followed with an amendment of the clause on payment of taxes, limiting it to loans at not more than five per cent., and to that was added a proviso "that nothing herein contained shall prevent the said Mayor and City Council from negotiating said loans or any part thereof, already authorized by law, but not yet actually issued, or which may be hereafter created and authorized by law, at a lower rate of interest than five per cent. per annum, whenever it may appear to the said Mayor and City Council practicable and advisable to do so." And the purpose of this proviso, like that of the Act of 1927, now in question, seems clearly enough to be to sanction actual negotiation at reduced rates of interest of loans previously authorized under the constitutional clause. The passing nature of this sanction in the Act of 1880 suggests that there may have been a practice already in existence of negotiating at reduced rates unissued portions of stock previously authorized, and a brief reference to the early ordinances for illustrations shows at least one instance in an ordinance approved June 30th, 1877, number 65, section 4, which, after providing for the issue of five per cent. stock to redeem the old six per cent. Baltimore Water stock, provided further that the department of finance might in its discretion negotiate on the same terms unissued stock previously authorized by law.

Upon these arguments, then, it appears to me that we cannot say that the Act of 1927, ch. 155, and the ordinance in pursuance of it, are in clear conflict with the Constitution and therefore invalid.

The fact that in *Stanley v. Baltimore,* 146 Md. 277, a case on the effect of a statutory designation of the rate of interest for a municipal loan, the court took the rate to be an integral part of the debt authorized, seems to me to present no obstacle to carrying out the conclusion argued for here if it is correct. My view is that the expressions in that case should be given no further effect than was needed for the decision of the case then in hand, and that if they are too broad, without some qualification or restriction, to be confined to the construction and application of the statute there under consideration, the qualification and restriction should be made now. It is inevitable that courts should be under the necessity of doing this at times, and this court has not hesitated to do it when needed. See *Owens v. Sprigg,* 2 Md. 457, 478; *Patterson v. Gelston,* 23 Md. 432, 445. In the case of *Carlson v. Helena,* 39 Mont. 82, 101, often cited on questions of municipal debts, a somewhat similar qualification of broad statements in a previous decision was made.

My conclusion has, for these reasons, been that the decree appealed from should be affirmed.

---

Memorandum by OFFUTT, J.

In the dissenting opinion filed in this case reference is made to various facts as justifying an inference of a contemporaneous construction of section 7, article 11, Const. of Md., supporting the author's construction of that provision. No reference was made in the opinion of the court to such facts, for the reason that they are not shown by the record, and are not of such a character as to permit this court to take judicial notice of them, and it is the unvarying practice of this court not to consider facts, the existence of which must be shown by proof, unless such proof or a substitute therefor appears in the record. I am authorized to say that the judges who concurred in the majority opinion concur in this expression.