PRESSMAN *v.* MAYOR AND CITY COUNCIL OF BALTIMORE, ETC., ET AL.

[No. 183, October Term, 1951.]

*Decided May 8, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

Argued by *Hyman A. Pressman,* in proper person, for appellant.

Argued by *Thomas N. Biddison, City Solicitor of Baltimore City,* with whom were *Edwin Harlan, Deputy City Solicitor* and *Daniel B. Leonard, Assistant City Solicitor,* on the brief, for appellees.

MARBURY, C. J., delivered the opinion of the Court.

This is a taxpayer's suit to enjoin the Mayor and City Council of Baltimore, and some of its officers, from spending $125,000, part of the proceeds of a loan, for street signs and block number plates. The defendants demurred, the Circuit Court of Baltimore City sustained the demurrer without leave to amend, and dismissed the bill. From this action, the complainant appealed.

By Chapter 132 of the Acts of 1951, the Mayor and City Council of Baltimore were authorized to issue certificates of indebtedness not exceeding $500,000, the proceeds thereof to be used "for the acquisition and installation of traffic control signals and signs and for

the purchase of such equipment and facilities as may be necessary therefor and for doing all things necessary in connection therewith or pertaining thereto." The preamble of the act recites that traffic hazards at street intersections in the city are constantly increasing, that it is particularly hazardous for children going to and from school to cross many of these intersections, that the demands for proper traffic control signals and signs are increasing much more rapidly than is the installation of such signs, and, under the present procedures, it will be many years before an adequate number of traffic control signals and signs will be erected, and that it is very urgent that such signals and signs be erected as promptly as possible in order to protect the public generally. The act was an emergency act, authorizing the Mayor and City Council by an ordinance or ordinances to authorize the issuance of the certificates of indebtedness. This was done under the provisions of Article XI, Sec. 7, of the State Constitution, which prohibits the creation of any debt by the City, unless such debt is authorized by an act of the General Assembly, and by an ordinance of the Mayor and City Council submitted to the legal voters of the City of Baltimore, and approved by a majority of the votes cast at such election. This section was first considered by this court in *Baltimore v. Gill,* 31 Md. 375, and is discussed in the case of *Baltimore v. Hofrichter,* 178 Md. 91, 97-98, 11 A. 2d 375. In pursuance of the authority given by Chapter 132, an ordinance (No. 1607) was passed on April 4, 1951, and was approved by the voters at the election on May 8, 1951. The ordinance used the identical language contained in the statute, and the loan was therefore approved by the voters for the purposes mentioned in the statute.

When the Ordinance of Estimates for the year 1952 was passed, it provided that the Department of Public Works should expend out of the proceeds of the sale of the certificates of indebtedness thus authorized, for traffic control signals $125,000, and "for street signs

$125,000". The appellant contends that the expenditure of $125,000 for street signs would be in violation of the enabling act, and of Ordinance 1607, and asks that the defendants be enjoined from so expending this amount of money out of the proceeds of the loan, and for a declaratory decree stating that the allocation of $125,000 in the Ordinance of Estimates for street signs is null and void. The City Solicitor in his argument, although not in his brief, admitted that the word "signs" in the enabling act and in the ordinance, must be interpreted as meaning "traffic control signs". We think this is a necessary construction, clearly indicated by the purpose of the enabling act as set out in the preamble. The question before us, therefore, is whether the street signs and block number plates, proposed to be installed by the City, are traffic control signs within the meaning of the enabling act and of the ordinance submitted to the voters.

The City contends that it should be allowed a broad discretion in determining what are traffic control signs. It suggests that there is a basis for including within those words street signs and block number plates, because they help the movement of traffic, both pedestrian and vehicular, by enabling travelers to see where they are on the street, and to locate their destinations more readily than would otherwise be the case. We find this interpretation too ingenious. Street signs and block number plates are not within the ordinary contemplation of anyone as traffic control signs. The mere fact that the City is growing, and that many new street signs and block number plates are needed, does not justify placing a strained construction upon words which we think the voters must not have placed upon them when they approved the ordinance. If it is necessary, on account of the number of these signs which have to be replaced or newly erected, to finance them otherwise than through the use of the proceeds of the tax rate, then the proper procedure for the City is to get an enabling act from the Legislature specifically

setting out this purpose, and to pass an ordinance submitting to the voters the question whether this should be accomplished as a capital expenditure. We do not think the Legislature intended, nor do we think that the voters could have thought that the Legislature and the City intended such an expenditure by the wording of Chapter 132 of the Acts of 1951 as repeated in Ordinance 1607.

The City relies upon the case of *Baltimore v. Williams*, 129 Md. 290, 99 A. 362. In that case, the enabling act authorized the issuance of $50,000,000 of stock for the establishment of "a comprehensive system for the improvement of the water front of, adjacent to and along the Patapsco River and its tributaries, both within and without the limits of the City of Baltimore." This loan was known as the Harbor Improvement Fund. A taxpayer's suit was brought to enjoin the City from spending the proceeds of this loan for the purpose of opening and widening St. Paul Street in the city, which was the street leading directly from the northern part of the town to Light Street, which then continued to the harbor. The court said that the contemplated widening was of an artery communicating with the harbor for a distance between one-half and three-quarters of a mile from the actual water front. The chancellor held that this was too remote, but this court did not agree with that conclusion. It held that there was discretion in the City to widen St. Paul Street as a desirable means by which to promote the accessibility of the water front. The enabling act of the Harbor Improvement Fund said, in so many words, that the City was to adopt *a comprehensive system,* and those words were italicized in the court's opinion, as showing the considerable discretion given to the City. This court held that it was obviously not intended that the money from the sale of the securities should be used only to take care of the immediate harbor, but that it was intended to do whatever was necessary to provide proper approaches to it, and, in so doing, the City had the authority to determine what

was "a desirable means by which to promote the accessibility" of the water front.

In other cases where no such general discretion was specifically given, this court has held that the City is bound to interpret strictly the authorization, and cannot deviate from it. Thus, in *Thom v. Baltimore,* 154 Md. 273, 277-278, 141 A. 125, 127, the enabling act and the ordinance provided for the issuance of bonds at an interest rate of 5%. The City desired to issue bonds at a lower rate which would have been of benefit and advantage to the public. This court recognized that fact and said: "* * * such a privilege may indeed be essential in marketing its securities to the best advantage, but if that freedom is abridged by constitutional prohibitions the remedy is to amend and not to overrule the Constitution." The court held that the City did not have the power to change the rate of interest. This case followed an earlier case, *Stanley v. Baltimore,* 146 Md. 277, 300, 126 A. 151, 159, 130 A. 181. In that case, the court said: "The power of the Mayor and City Council of Baltimore in this instance is a special and limited one, and must be 'administered in the manner and according to the law creating it.'" We do not think that there is any discretion in the municipal officials to construe "traffic control signs" as meaning something which, in our opinion, the words could not have meant in the enabling act, and could not have meant in the minds of the voters.

Section 7 of Article XI had been adopted at a time when the people were much disturbed about the improper expenditure of the public money. The City had been quite reckless in this respect. See LXVI Political Science Quarterly 411, 431, issue of September, 1951. A provision limiting the State itself had been inserted in the Constitution of 1851, repeated in the Constitution of 1864, and again repeated as Sec. 34 of Article III of the Constitution of 1867. The Constitution of 1867 also included a somewhat similar limiting provision for the counties in Sec. 54 of Article III. These two last mentioned sections of the Constitution have each been

before this court and have each been fully discussed in two recent cases: *Johns Hopkins University v. Williams,* 199 Md. 382, 86 A. 2d 892, and *Melvin v. County Commissioners,* 199 Md. 402, 86 A. 2d 902. All of the three sections of the Constitution were intended, in a broad sense, to safeguard the public money, to pervent the making of improvident investments, and to keep the public debt from imposing too great a burden upon the State, the counties, and the City. The safeguards provided in each case were different, but the purpose was common to all. The City provision was triply safeguarded, first, by the necessity of an enabling act, second, by the passage of an ordinance, and third, by the submission of the ordinance to the voters. The scope of the use of the money intended to be borrowed might be broad, as in the case of the Harbor Improvement Fund. If the voters approved such a broad authority, they would obviously approve the exercise of discretion by the municipality in carrying out the purpose for which the debt was created. Where the purpose is narrow and restricted, as in the case before us, the voters could not have understood that they were voting for anything but signs which had, for their primary purpose, the control of traffic. The kind and character of such signs, provided they are clearly and obviously intended for traffic control, is a matter within the discretion of the municipal authorities, but it is not within their discretion to determine their own authority as given them by the legislation approved. That is a matter of judicial interpretation, and we are unable to find that the City in this case has any authority to expend any of the proceeds of this loan for street signs and block number plates.

The order will be reversed and the case remanded for such further proceedings, if any, as may be necessary.

*Order reversed with costs and case remanded.*