## McKAIG *v.* MAYOR AND CITY COUNCIL OF CUMBERLAND

[No. 179, October Term, 1954.]

96

*Decided July 28, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*W. Earle Cobey*, with whom was *Charles Z. Heskett* on the brief, for the appellant.

*William A. Gunter* and *Thomas B. Finan* for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The appellant, as a taxpayer and property owner, brought a suit in equity on behalf of himself and of any other taxpayer or interested party against the City of Cumberland to have declared illegal and void the action of the City in approving an agreement between the City and the State Roads Commission of Maryland for the construction of a crosstown expressway or viaduct and other highways in the City and to enjoin the City from carrying out the agreement. The City demurred to the amended bill and the Circuit Court for Allegany County entered a final order sustaining the demurrer. The appeal is from that order.

The agreement which gives rise to the controversy (referred to below as the "Agreement") was approved and its execution was authorized by the Mayor and City Council of Cumberland on August 9, 1954, and on the same day the appellant filed his original bill in this case to prevent its being carried into effect. Under the provisions of the Agreement the State Roads Commission (referred to below as the "Commission") agrees to construct the crosstown expressway or viaduct and related

100

highways, which together form one project, and the City undertakes certain obligations referred to below. The project is described as eligible for Federal Aid Urban Funds under the Federal Highway Acts of 1952 and 1954, and the use of such funds is contemplated. Under the agreement the City is to furnish a total of $490,000 to match Federal funds in like amount by allocating $70,000 a year for seven years from the City's share in the Gasoline Tax and Motor Vehicle Revenue Funds (as established under Code (1951), Articles 56 and 66½ respectively) "or from any other source that may be legally available to it." These funds and the Federal funds above mentioned are to be used for construction of the viaduct and other highways, and the Commission is to assume full responsibility for the construction of the viaduct and highways. The bill states that the total cost of the project may exceed $12,000,000. The City's cash contribution of funds to be made available to the Commission or by way of "matching funds" is, however, limited to the $490,000 above mentioned.

Other undertakings, the cost of which is to be assumed by the City under the Agreement, may be summarized as follows: the relocation of any public utilities (except such facilities as are customarily adjusted by their owners); the installation of necessary traffic lights; the adjustment of curb returns on one street; the adjustment of automatic traffic signals on another; the prohibition of parking on two streets; the closing of two others at their intersections with one of the approaches to the crosstown expressway; the installation and maintenance of necessary lighting on the expressway; the furnishing of "any curbs, gutters or sidewalks which the City desires" and which are not necessary adjuncts to the construction of the expressway; maintenance of one street previously maintained by the Commission; and the maintenance of all intersecting streets and service roads constructed or reconstructed by the Commission as part of the project. The Commission is to undertake the maintenance of the expressway. If any City-owned land is in-

cluded in the area to be traversed by the expressway, the City is to contribute such land without making any charge therefor. If it is feasible to permit parking under any part of the viaduct the City is to receive the revenues.

There are three questions of law at issue: (1) Has the appellant as a taxpayer and property owner, the right to maintain the suit; (2) Has the City the power to enter into the Agreement; and (3) If so, is the Agreement so vague and indefinite that its approval would constitute an unreasonable exercise of the powers of the City? We shall take these questions up in the order stated.

1. The Right of the Complainant to Maintain the Suit.

As already noted, the appellant brought this suit as a taxpayer and as an owner of property in the City of Cumberland on behalf of himself and of any other taxpayer or interested party who might wish to come in as a complainant and contribute to the costs of suit. No one else has elected to join him as a party complainant. The City challenges his right to maintain the suit.

We think it unnecessary to consider the possible rights of other, but unspecified, interested parties to join in the suit, or the right of the complainant to bring suit on behalf of such persons. We also think it unnecessary to determine whether the fact that the appellant owns property lying in the path of the proposed expressway gives him any special interest which would entitle him to maintain the suit on the ground that he may sue to prevent the improper condemnation of his property, even though he may be fully paid for his property. In this connection we note that under the Agreement, the Commission, and not the City, undertakes to acquire the right of way. There is, of course, no direct challenge to the State's power of condemnation. If it is in some way open to attack in this case, it would seem that such an attack would have to be based upon the theory that the State's power to condemn would be lost because of its being exercised in furtherance of an agreement which the complainant says the other party, the City, had no

right to make. Such a contention might carry us far afield; and because of our views expressed below with regard to the complainant's right to maintain his suit as a taxpayer, we see no need to go into this matter any further.

As the carefully considered opinion of the Circuit Court points out, a court of equity will restrain a municipal corporation or an administrative agency from entering into or performing an unlawful or *ultra vires* contract, when such action may injuriously affect the taxpayer's rights and property. *Coddington v. Helbig,* 195 Md. 330, 73 A. 2d 454; *Rushe v. Hyattsville,* 116 Md. 122, 81 A. 278; *City of Baltimore v. Gill,* 31 Md. 375; *City of Baltimore v. Keyser,* 72 Md. 106, 19 A. 706; *Ruark v. International Union of Operating Engineers,* 157 Md. 576, 146 A. 797; *Thom v. Baltimore,* 154 Md. 273, 141 A. 125; *Castle Farms Dairy Stores v. Lexington Market Authority,* 193 Md. 472, 67 A. 2d 490; *Funk v. Mullan Contracting Co.,* 197 Md. 192, 78 A. 2d 632.

The City contends that the complainant has not shown that he will suffer any pecuniary loss, and bases this contention largely on the ground that he has not expressly stated that the carrying out of the Agreement will increase his taxes. The bill does allege that the sum of $70,-000 a year is to be diverted for seven years from moneys which would otherwise be available to the City for highway maintenance and like purposes and is to be used to help to pay the cost of construction of the expressway. It seems evident from the fact alone that the latest City budget ordinance (a copy of which was filed with the bill) provides more than $127,000 for streets and alleys that the funds will have to be replaced by moneys derived through increased taxes, of which the complainant will have to pay his share. Cases relied on by the City, such as *Williams v. City of Baltimore,* 128 Md. 140, 97 A. 140, and *Phillips v. Ober,* 197 Md. 167, 78 A. 2d 630, where no pecuniary loss could be shown, are not applicable. *Funk v. Mullan Contracting Co., supra,* also cited by the City, upheld the right of taxpayers to sue because of increased

costs to which they would be subjected and distinguished *Phillips v. Ober* on the ground that in the latter case "it was not alleged that the taxpayers would be pecuniarily affected." In the instant case we think the facts alleged are sufficient to indicate that taxpayers will be pecuniarily affected.

*Funk v. Mullan Contracting Co., supra,* is also direct authority for the rule that although the taxpayer may be wrong in his contention, he nevertheless has the right to invoke the aid of a court in order to make his contention.

The City's claim that the complainant's taxes would not be increased sufficiently to satisfy the twenty dollar jurisdictional requirement for maintaining a suit in equity was not pressed nor was it, nor could it have been, demonstrated to be arithmetically sound since the assessed value of only a part, but not of all, of the real estate in Cumberland owned by the plaintiff was shown. It is unnecessary to consider whether the interests of the taxpayers as a whole should be taken as the measure of the amount in controversy on the theory that this is a class suit.

2. Power of the City to Make the Agreement.

The appellant contends that because of certain restrictions and limitations placed upon the City by the terms of its Charter (Article 1 A of the Public Local Laws of Maryland, as recodified in Everstine's 1950 Edition of the Charter and Ordinances of the City of Cumberland), particularly Sections 117, 118 and 148, as in force when the Agreement was approved, which are directed towards the City operating on a balanced budget and a pay-as-you-go basis and Section 81, sub-sections (c), (d) and (e) which limit the borrowing power of the City, the Agreement is *ultra vires.* Under these restrictions the City's borrowing power is limited to the following: (1) to borrow against anticipated revenue for the current year; (2) to borrow not more than $50,000 (and that only with the approval of the Circuit Court for Allegany County) to meet an emergency; and (3) to bor-

row through the issuance of bonds, if the loan is approved by a referendum vote. Section 148 restricts the amount which can be appropriated for capital expenditures to not more than 4% of the total appropriations for any year, and this amounts to less than $70,000 on the basis of the latest budget.

The trial court summarized the situation under the charter powers and limitations in these statements, which the City agrees are correct:

"Nowhere is it provided the City has power to pledge anticipated revenues and bind subsequent administrations in the manner in which it has done in this contract with the State Roads Commission.

"Since the power to anticipate revenue is prohibited except for two methods, neither of which was followed, we must look elsewhere than to the Charter to uphold the attempted pledging of the Gasoline Tax Fund and Motor Vehicle Revenue."

The chief sources of power outside of the Charter upon which the City relies are sub-sections (3) and (5) of Section 63 of Article 89 B of the Code (1951 Edition). The present Section 63 was originally enacted by Chapter 964 of the Acts of 1945. The title of that Act states that it is to add a new section to Article 89 B of the Code, title "State Roads Commission", sub-title, "Duties and Powers", and then describes the Act as "relating to the acceptance, use, application and administration of federal funds to be allotted to the State of Maryland, through the State Roads Commission, for the benefit of the road and bridge system of the State; the street and highway system of the City of Baltimore; the secondary or feeder road system of the counties; the street and highway system of the cities, counties and municipalities and the other agencies and political subdivisions of government in the State of Maryland; providing the purposes for which and conditions under which federal funds may be accepted in the construction of streets, highways, bridges, roads and appurtenances; providing the manner in which the counties, Baltimore City, and municipali-

ties, cities and the agencies and political subdivisions in the State may provide for supplying funds in equalization of federal funds, whether by taxation, bonded debt, pledges and advancement of funds or otherwise."

Section 63 (then designated as 48A) was amended by Chapter 560 of the Acts of 1947, and has remained unchanged since then. This Act was a comprehensive statute. It provided, among other things: (1) for a large highway construction program and authorized a bond issue for such purposes in the aggregate principal amount of $100,000,000; (2) for the payment of moneys into the Gasoline Tax Fund and the Motor Vehicle Revenue Fund and the allocation and distribution thereof to the State and its counties, municipalities and taxing districts; and (3) for obtaining and for the use of funds available under then existing or future Federal statutes for aid to State highway construction projects. The title stated at the outset that the Act was "to provide for the financing, planning, constructing and maintaining of public roads in the State" and then went on for some four pages to refer to particular Sections of several different Articles of the Code which were amended, repealed or added, describing briefly the matters to which those Sections pertained. In referring to what was then Section 48A (now Section 63) of Article 89 B, the title stated that the Act was "to amend Section 48 A of said Article 89 B * * * title 'State Roads', subtitle, 'Duties and Powers', as amended by Chapter 964 of the Acts of 1945, assenting to the provisions of certain Acts of Congress providing for Federal Aid for the construction of State roads, and empowering the State Roads Commission and the various subdivisions of government in the State to do any and all acts and things necessary or desirable to obtain the benefit of such Federal aid; * * *."

Subsection (2) of Section 63 of Article 89 B, which largely repeated and somewhat amplified subsection (1) of this Section as enacted in 1945, provides that the Commission, "on its own behalf or on behalf of any

county * * * [or] city * * * in the State of Maryland, and the counties * * * [and] the cities * * * in the State of Maryland and their duly elected or appointed officers are hereby expressly authorized and empowered, respectively, to do any and all acts and things necessary or desirable to comply with the terms, conditions and provisions and to obtain the benefits of the provisions of the Federal Acts."

Subsection (3), which was subsection (2) in 1945, expressly authorizes the counties, cities, etc., in order to effectuate "the aforegoing" to raise funds by borrowing and by taxation, and provides that "such power and authority shall be in addition to the powers conferred by any other law" and that "Bonds may be issued under this sub-title, notwithstanding any debt or other limitation prescribed by any other law." Then follows a declaration of legislative purpose to enable the Commission, the counties, cities, etc. "to equalize and secure the benefits of" any Federal funds available for use in a program of construction and reconstruction of roads, bridges, highways, and so forth, and "to thereby assist in the national recovery and for the purpose of promoting the general welfare."

The City claims that this subsection authorizes it to borrow money to meet expenditures of the kind to which it is committed under the Agreement. The appellant contends that the title of Chapter 964 of the Acts of 1945 gives no warning of an intention to repeal debt limitations in the Charter of Cumberland, or of any city for that matter, and that the title is deficient under Article III, Section 29, of the Maryland Constitution. The City controverts this contention and also relies on the broad language in the title of the amendatory act, Chapter 560 of the Acts of 1947 as sufficient.

The Circuit Court pointed out that no action has been taken by the City upon the supposed authority of subsection (3) and that it was, therefore, unnecessary to pass upon the question in this case. We agree that the question need not be decided in this case, because neither a plan to borrow nor the need to borrow beyond the

Charter limitations has been shown.

We turn then to subsection (5) of Section 63. So far as here pertinent, it reads as follows:

"In the event that * * * the cities * * * do not provide funds in any of the manners authorized in the preceding sub-sections hereof to equalize and secure the benefits of the said Federal funds and allotments, then the State Roads Commission, the State Treasurer and the State Comptroller are further authorized and empowered to permit the use by the * * * cities * * * of their respective shares of the Gasoline Tax Fund and other funds available for them under the provisions of this Article in order to enable them to equalize, match and secure the benefits of any Federal funds allocable to * * * the cities * * * from the funds made available to Maryland by the provisions of the Federal Acts."

It was stipulated by the parties that the consents of the Commission, of the Comptroller and of the Treasurer required by sub-section (5) have been given for the use of the City's share of the Gasoline Tax and Motor Vehicle Revenue Funds to secure and match Federal funds, as provided by the Agreement and that this fact might be considered in ruling on the demurrer.

The Gasoline Tax Fund and the Motor Vehicle Revenue Fund (which is another fund available under Article 89 B and is added to the Gasoline Tax Fund) are wholly creatures of the State, and are subject to its control. Such portions as the State has allocated or may allocate to the City of Cumberland form no part of the funds which the City raises by taxation, and the City's budgetary practice does not alter the source or character of these funds, nor does it purport to do so. The use of these funds for the intended purposes of matching Federal funds and of paying a part of the cost of construction of the expressway are clearly within the purposes authorized by Sections 22 and 26 (3), as well as by Section 63, of Article 89 B.

No repeal or amendment of any portion of the Charter of the City seems to be involved in such use, and hence

there appears to be no possible need to refer to the Charter of Cumberland or of any other municipality in the title of the Act; and likewise no conflict arises between a local law and a general one.

We hold that the provisions of sub-section (5) of Section 63 authorizing cities, with the consent of the State officials mentioned above, to use their share of the Gasoline Tax Fund and of other funds available to them under Article 89 B for the purpose of matching and obtaining the benefit of Federal-aid highway funds are valid, and that insofar as the Agreement provides for such use of the City's share of the Gasoline Tax Fund and the Motor Vehicle Revenue Fund it also is valid.

The appellant objects to the other commitments to be undertaken by the City on the grounds that they would involve a surrender of the City's legislative power or advance commitments of revenue or a violation of the Charter limitations against borrowing.

The alleged surrender of legislative power seems a trivial matter. The City has the power to close streets, and it agrees to exercise it. The same is true of some changes in curbs which it is to make.

The maintenance of streets (other than those maintained by the Commission) is an obligation resting upon the City, quite apart from the terms of the contract. We see no valid reason why the City should not retake control of one street and undertake the maintenance thereof as a part of an agreement by which the State puts up about 90% of the cost of a new highway and assumes the maintenance thereof, and the street returned to City control and maintenance will serve to increase the basis upon which the City's participation in the Gasoline Tax Fund is based. If the assumption of the cost of maintenance of a street involves an improper commitment of future revenues, it is difficult to see how the street system of the City could ever be extended without encountering the same objection. Similar observations apply to the lighting of streets.

On the subject of capital expenditures, other than the cost of the expressway itself, it seems that there are several items covered by the contract which might call for such expenditures: the relocation of utilities, other than those which are customarily adjusted by their owners; the installation of traffic lights and lighting on the expressway; the adjustment of some curb returns; and the adjustment of traffic lights on one street. The cost of these is not shown and no necessity to borrow or to pledge the credit of the City in order to finance them is shown. We can hardly hold the agreement invalid on its face (as the appellant asks us to do when the case comes before us on demurrer) because of these possible capital expenditures on the basis of his vague allegation that "estimates vary as to the aggregate amount of said expenditures" and his further allegation that the time when the City will have to make them cannot now be determined, and the conclusion which he seeks to draw therefrom that these expenditures are "in effect payments for capital improvements on the instalment plan."

The appellee contends that the aggregate amount of these expenditures will be comparatively small. It takes the position that the only type of capital expenditures called for which might be costly is the relocation of utilities; but it claims that the exception stated in the contract will relieve the City of almost all of that potential burden, because the owners of the utilities involved will pay the cost of relocating their respective lines. Since none of these owners are parties to the case their rights are not before us for adjudication. The appellee also contends that most, if not all, of the lighting and traffic light equipment which it is to furnish can be obtained on a rental basis which would not involve any capital outlay, but there is nothing about this in the record.

These differences between the parties emphasize the vagueness of the bill and the paucity of facts on this phase of the matter. Taking as true, as we must in passing upon a demurrer to the bill, all well pleaded facts, we do not find the allegations here sufficient to

show that compliance with the capital expenditure provisions of the Agreement would contravene the limitations upon the borrowing power of the City expressed in its Charter, if they are applicable,—a question which we find it unnecessary to decide. If such a situation should develop in the future there would be nothing to preclude a suit at that time to prevent a violation of any Charter restrictions which might be applicable. We may note in passing that on the basis of the City's budget figures it would seem possible that the excess of the City's share of the Gasoline Tax Fund (including therein its share of the Motor Vehicle Revenue Fund) might be sufficient to cover any of these capital expenditures which the City might have to make, without touching the City's own tax receipts or any of its loan funds.

There is no need for further extended comment on the City's commitment to furnish $490,000 over a period of seven years out of its share of the Gasoline Tax Fund and the Motor Vehicle Revenue Fund or "from any other source that may be legally available to it." If there is no other source legally available, there is no further obligation on the City, according to the express language of the Agreement. The Commission assumes that risk.

In connection with the power to borrow money to meet its commitments which the City claims, it asserts in its brief in this Court that it is already authorized under Chapters 72 and 652 of the Acts of 1953 to issue bonds, the proceeds of which may be used for such highway purposes as are contemplated by the Agreement, and that bonds aggregating $250,000 in principal amount authorized under these Acts remain unissued, and that the proceeds would be more than would be required to meet its commitments other than the $490,000. The City also states that both the existence of these bonds and the purposes for which the proceeds thereof might be used were brought up at a pretrial conference at which the filing of the amended bill was agreed upon. These facts were not, however, alleged in the bill or otherwise made a part of the record, and consequently

there is no reference to them in the opinion of the Circuit Court. Though we certainly have no reason to doubt the correctness of the City's statement as to the amounts of its unissued bonds, we equally certainly cannot take judicial notice of their existence or amount. We may, of course, take judicial notice of the two statutes cited. We note that the title of each states that the Act authorizes the Mayor and City Council of Cumberland to issue bonds in a stated amount and to levy taxes to pay the principal thereof and the interest thereon, and that the Act repeals all Acts or parts of Acts inconsistent with its provisions. We also note that Section 6 of each Act does repeal any inconsistent provisions of the Charter of Cumberland to the extent of such inconsistency and that none of the limitations on the City's borrowing power contained in the Charter or in any other law which limits or restricts any power granted by the Act shall be applicable. Section 5 of each of these Acts expressly authorizes the Mayor and City Council of Cumberland "to accept from any Federal or State agency, grants for or in aid of the construction of any project contemplated herein, and to make such contracts containing such terms, provisions and conditions as in the discretion of the said Mayor and City Council may seem necessary, proper or advisable for the purpose of obtaining or securing grants or financial assistance from any Federal or State agency willing to extend the same in furtherance of any of the purposes of this Act." So far as we are informed, the City has not undertaken to make any use of the contracting power which the above quoted provisions purport to give in connection with the Agreement involved in this case. We find no repugnancy to sub-section (5) of Section 63 of Article 89 B in these local Acts. Their effect upon, or relationship to, sub-section (3) is not presently involved, because we have found it unnecessary to pass upon the validity of sub-section (3).

3. Alleged Indefiniteness of the Agreement and its Reasonableness.

The appellant attacks the Agreement as being so vague and indefinite that its approval by the City constitutes an unreasonable exercise of its powers.

The first ground of this criticism is that there is nothing to show the location of the bridge. That objection seems to be answered by a letter from the Chairman of the State Roads Commission and a map therein referred to, which have been admitted by stipulation or agreement, much as the consent of State officials was stipulated. The map shows a definite route for each of the three elements of the planned expressway, and the letter indicates that if there are any changes, they will be only minor relocations. Absolute exactness at this stage of the proceedings is not necessary. See *State Roads Commission v. Franklin,* 201 Md. 549, 95 A. 2d 99, a condemnation case, and Code (1951), Article 89 B, Section 53, permitting the Commission to make changes in the location of projected roads.

The absence of specifications relating to the construction of the bridge is next complained of. This, too, is not persuasive. Such specifications would be essential if the contract were a contract for the actual construction of the bridge, but in an agreement of the type here involved detailed plans and specifications would be of no apparent use to either party.

It is also objected that the cost of the commitments of the City (beyond the $490,000 contribution to the cost of the expressway) cannot now be determined. That may affect its desirability, but not its validity as a contract. This uncertainty has already been discussed at length in considering the power of the City to enter into the Agreement.

The absence of a starting date for the State to begin work is also criticized. We think that, under the ordinary rule, where no time is specified a reasonable time will be implied.

As the Circuit Court pointed out, this contract is between two public bodies, and its terms appear sufficiently definite to effectuate its purposes. There is no such

vagueness of consideration as there was in *Hanlon v. Levin,* 168 Md. 674, 179 A. 286, relied upon by the appellant. In that case an agreement between the Board of Park Commissioners of Baltimore City for the lease of land in a public park to a radio broadcasting company was held void for two reasons—first, that the Board had no power to lease to a private corporation land which was dedicated to a public use, and second, that the consideration moving to the City was too vague and indefinite. This consideration was that the Board of Park Commissioners and the Mayor of the City should "have free time at hours appropriate to the purpose to be served, for broadcasting information of a civic, educational and non-political nature" over the radio station involved.

Here the City is to put up $490,000, the Federal Government is to furnish a like amount, and the State of Maryland is to furnish the additional funds needed to construct a three-way major traffic artery in the City of Cumberland, the total cost of which the appellant says may exceed $12,000,000. In other words, for a direct outlay of a little more than 4% of the total cost of construction and some possible additional capital expenditures of what would seem a relatively small amount, the City is to get a modern expressway system.

There is no charge or suggestion of fraud, collusion or bad faith. The decision to go ahead with the expressway was one which we think was entrusted to the Mayor and City Council. We find nothing in the case which would warrant a finding of any abuse of discretion on their part in reaching the conclusion at which they have arrived, and we think that the order appealed from was correct. See *State Roads Commission v. Franklin, supra, Coddington v. Helbig, supra, Masson v. Reindollar,* 193 Md. 683, 69 A. 2d 482.

*Order affirmed, with costs.*